SLATER ELECTRIC, INC., Plaintiff,

v.

THYSSEN–BORNEMISZA INC., a
corporation formerly known as
Indian Head, Inc., Defendant.

No. 81 Civ. 6101–CSH.

United States District Court,
S.D. New York.

Nov. 14, 1986.

John A. Diaz, Robert E. Paulson, Christopher A. Hughes, Morgan & Finnegan, New York City, for plaintiff, Slater Elec., Inc.

Granger Cook, Jr., Russell J. Barron, Cook, Wetzel & Egan, Ltd., Chicago, Ill., for defendant, Thyssen-Bornemisza, Inc.; Charles F. Richter, Quasha, Richter, Schneider & Wessely, New York City, William R. Laney, Laney, Dougherty, Hessin & Beavers, Oklahoma City, Okl., of counsel.

HAIGHT, District Judge:

Plaintiff Slater Electric Inc. began in 1973 to manufacture and sell a molded plastic electrical outlet box incorporating a useful labor-saving innovation. An outlet box is the rectangular, open-faced box in which an electrical wall outlet unit is mounted. To secure the outlet in a wall, the outlet is ordinarily screwed into the box, and the box is nailed to a wall stud. Plaintiff's particular innovation was to develop a way to speed the process of screwing the outlet unit into the box. By means of small metal clips placed in identical, carefully designed holes at the top and bottom of the plastic box, plaintiff made it possible for the screws securing the outlet in the box to be pushed, rather than screwed, into place. Apparently this innovation satisfied a need in the construction industry, for the new box proved popular, and plaintiff's competitors allegedly scrambled to copy it. One of those scrambling competitors was defendant Thyssen-Bournemiza ("T–B"), which began in 1981 to manufacture an outlet box with a similar clip-and-hole device which accomplished the same labor-saving end.

Plaintiff, which in the meantime had secured three patents on various aspects of its outlet box, promptly brought this suit for patent infringement. T–B has answered that its box does not infringe the patents on the Slater device, but that even if it does the patents are invalid. Presently before the Court are cross-motions for summary judgment addressed solely to the issue of infringement. Slater claims that the facts indisputably demonstrate infringement; T–B claims the exact opposite.

## I. The Invention and the Accused Device

As noted above, the invention is an electrical outlet box into which screws securing the outlet may be pushed rather than screwed. The box has only two components, a molded plastic box and small metal clips inserted at each end of the box. Unthreaded holes are molded into bosses at each end of the box; the holes receive, but do not secure, the screws. The small clips, punched from sheet metal and inserted in slots next to the holes, secure the screws by means of a prong which projects from the clip into the hole and engages the threads of the screw. The prong is bent in the direction of inward movement of the screw. Because the prong is flexible, the threads of the screw slide over it, ratchet-like, as the screw is pushed in, but it catches the threads and resists if an attempt is made to pull the screw out, against the direction of the bend. This permits the screw to be tightened against the prong.

The three drawings below, taken from one of plaintiff's patents, illustrate one, although not the only, physical embodiment of this invention. Figure 1 shows an exploded view of the outlet box and outlet.

The boreholes which receive the screws are located in bosses formed at the top and bottom of the box; the clips, numbered 8, are inserted in the bosses near the holes.

Figure 1

Figure 2 is a sample clip. The prong which engages the screw threads is numbered 23.

Figure 2

Figure 3 is a cross-sectional view of the hole and clip with a screw inserted.

Figure 3

The invention is a rather simple one. It contains one additional feature which requires some discussion in order to clarify the terms of this dispute. A major design problem for this type of device is devising a means for securing the clip in the slot next to the hole. Some such means is necessary, for pushing the screw in tends to push the clip inward out of the slot, while tightening the screw against the prong tends to pull the clip out of the slot in the other direction. In the example shown in Figures 1–3, this problem is solved by way of the two additional prongs punched from the clip, numbered 21 and 22 in Figure 2. As can be seen from Figure 3, these two prongs grip either side of a ridge, numbered 10, molded into the box inside the clip-holding slot. By abutting the ridge, prong 21 resists the outward pull caused by tightening the screw while prong 22 resists the inward push produced when the screw is inserted.

Because it works in a similar manner, the accused device is best described in relation to the sample invention shown above. The accused device is also a molded plastic outlet box with metal clips designed to permit screws to be pushed into them. The device uses an outlet box like that seen in Figure 1, with bosses for receiving the screws molded into either end of the box. The clip is inserted into a slot adjoining the screwhole, but the hole and clip are shaped differently from those of plaintiff's sample invention. Figures 4 and 5 are two views of defendant's clip, an L-shaped affair with several tabs. Figure 6, analogous to Figure 3 above, is a cross-sectional view of the assembled clip and hole.

Figure 4

Figure 5

Figure 6

Although the clip and hole of the accused device are shaped differently from those of the sample invention, they have similar functional features. Two prongs, numbered 1 in Figures 4 and 5, engage the threads of the screw. Like prong 23 in the patented device, they are bent in the direction of inward movement of the screw; they give if the screw threads are pushed over them but catch the threads and resist if outward force is applied to the screw. A second set of prongs, numbered 2, engages a pair of ridges, numbered 3 in Figure 6, which are molded onto either side of the hole and prevents outward movement of the clip. The prongs and ridges are situ-

ated so that a screw slides between them when inserted. By preventing outward movement of the clip, these prongs perform the function of prong 21 of the patented device. In contrast to plaintiff's clip, defendant's is not wholly internal. The short leg of the "L" remains outside the hole. The screw is inserted through the a square in this leg. Flaps on either side of the short leg of the "L," numbered 5 in Figures 4 and 5, prevent inward movement of the clip by resting in grooves cut in the top of the boss on either side of the hole. These perform the function of prong 22 of the patented device.

Plaintiff is suing for infringement of two patents. United States Patent No. 8,105,-862 ("the '862 patent") covers an "outlet box having screw mounting means," i.e., the outlet box described generally above. United States Patent No. 4,188,854 ("the '854 patent") covers "screw mounting means," i.e., the clip and hole device described above which is used to secure the outlet in the box. Thus the '862 patent includes the device described in the '854 patent. In its cross-motion for summary judgment, plaintiff contends that defendant's outlet box and the means defendant's box uses to secure the outlet in the box fall within the description of the invention embodied in certain of the claims of the '862 and '854 patents. If the accused device falls clearly within the bounds of these claims a case of literal infringement is made out. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir. 1984). Defendant contends essentially the opposite: that when the claims in the patents are properly construed—that is, construed in light of the prosecution history and specifications of the patents—the accused device plainly falls outside of them. In addition, defendant claims that in various statements plaintiff made to the patent examiners during prosecution of these patents it effectively disclaimed coverage of a device like defendant's. As a result, it is argued, plaintiff is estopped from claiming infringement now.

## II. *The Prosecution History of Plaintiff's Patents*

Central to defendant's motion is the prosecution history of the patents. Both arise from a 1971 application for a patent on a "screw mounting means." In that application, the drawings reproduced as Figures 1–3 were used to illustrate the "preferred embodiment" of the invention sought to be patented.[1] With a few exceptions, claim one of the 1971 application, the broadest claim, is identical to claim one of the '854 patent here at issue.[2] The examiner in the Patent Office rejected the 1971

---

1. The "preferred embodiment" is a practical, workable example of the invention described by the claims of the patent. Inclusion of a preferred embodiment does not limit the range of physical entities which are covered by the patent to that described in the embodiment; the range continues to be delimited by the claims. *See Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed.Cir.1983) (narrow claims cannot be used to limit broad claims).

2. Claim one of the '854 patent reads as follows: What is claimed is:
1. Threaded screw mounting means, comprising: a screw mounting member; a screw-receiving unthreaded borehole formed in said mounting member; a first axially extending slot formed in the wall of said borehole; a second slot formed in said mounting member adjacent said borehole and extending generally parallel thereof, said first slot communicating said borehole with said second slot; and a clip member slidably receivable in said second slot, said clip member including first detent means projecting through said first slot into said borehole, said detent means permitting inward axial movement of a threaded screw into said borehole and preventing outward axial movement of a threaded screw therefrom; and means slidably fixedly locking said clip member in said second slot.

Claim one of the 1971 application was identical except that the last few lines read "said detent means permitting inward axial movement of the threaded screw into said borehole and *resisting* outward axial movement of a threaded screw therefrom; and means *fixedly mounting* said clip member in said second slot." (emphasis added to highlight differences).

application as both anticipated by the prior art and as an obvious modification of prior art structures. Claim one of the 1971 application was amended slightly [3] in an effort to persuade the examiner of its distinction from the cited prior art, but the effort was futile. The examiner again rejected the claims as anticipated, and plaintiff abandoned its application.

In 1973 plaintiff tried again. A new application for a patent on a "screw mounting means" was submitted which carried over much of the material in the 1971 application but added an alternative preferred embodiment of the invention. The new embodiment involved use of a differently shaped clip, seen in Figure 9, *infra*. Claim one of the new application, designed to accommodate both embodiments, is identical to claim one of the '854 patent.[4] This application was considered by the same examiner who rejected the 1971 application and, perhaps not surprisingly, was rejected for similar reasons. In submitting an amended 1973 application, plaintiff amended claim one in an apparent attempt to define more precisely the role of the prong which engages the screw. This fared no better. The examiner once again rejected the broad claims. However, he did suggest a narrower combination of claims which he would accept. Plaintiff capitulated, and the 1973 application resulted in issuance of United States Patent No. 3,955,463. Plaintiff has not alleged that this patent is infringed.

During plaintiff's prosecution of the 1973 application, the examiner brought to plaintiff's attention a new patent for a plastic electrical outlet box with a metal retaining clip granted to an inventor named Pringle. Pringle's patented device used a structure similar to plaintiff's preferred embodiment for its screw mounting means. Having filed its 1971 application prior to Pringle's filing of his application, plaintiff decided

that it should have been recognized as the first inventor of this device. It sought to have itself declared the proper owner of the Pringle patent by provoking an interference. In order to do so, it filed a new application in 1975. The new application was similar to the 1971 application, but it included as one of its claims an electrical outlet box using the 1971 application's screw mounting means. After reviewing the 1975 application, an examiner who had not previously evaluated plaintiff's invention declared plaintiff the first inventor of the invention disclosed in the Pringle patent. Plaintiff was awarded priority. This award resulted in the '862 patent. Claim one of the Pringle patent became claim one of the '862 patent. Claim two of the '862 patent covers an electrical outlet box incorporating a screw mounting means which is described in language essentially identical to that used in claim one of the amended 1971 application.

In 1977, prior to the grant of the '864 patent, plaintiff submitted a third application for a screw mounting means patent. Claim one of the application was identical to claim one of the '854 patent—in other words, identical to the language which had twice before, in the amended 1971 and initial 1973 applications, been rejected as anticipated by or obvious from prior art. The 1977 application was assigned to a different examiner than the first two applications. The new examiner apparently did not share the scruples of the initial examiner, for he eventually granted a patent, the '854 patent, on the claims included in the 1977 application.

### III. *Prosecution History Estoppel*

In its moving brief, defendant describes this prosecution history in much greater detail, discussing at length the many arguments which Slater made to the various patent examiners in an effort to persuade

---

**3.** The amendments involved changing the word "resisting," to "preventing" and changing the word "mounting," to "locking." *See* note 2, *supra*. This made the claim nearly identical to claim one of the '854 patent.

**4.** The only difference between claim one of the 1973 application and amended claim one of the 1971 application was the insertion of the word "slidably" before the words "fixedly locking" in amended claim one of the 1971 application. *See* notes 2 and 3, *supra*.

them that its invention was patentable. Defendant asserts that during the course of these arguments Slater disclaimed coverage by its patent of a product embodying the features of defendant's accused device. By way of "prosecution history estoppel," defendant seeks to preclude plaintiff from now reclaiming this allegedly abandoned territory.

 "Prosecution history estoppel," frequently referred to in the past as "file wrapper estoppel," is invoked in relation to, and as a counter to, the doctrine of equivalents. Indeed, estoppel is "irrelevant" unless an equivalent is claimed. *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1571 (Fed.Cir.1983). The doctrine of equivalents permits a patentee to claim broader scope for his or her patent than the literal language of the claims would otherwise allow. Pursuant to the doctrine, a patent is taken to cover not only embodiments within the literal language of the claims but devices which "perform[ ] substantially the same function in substantially the same way to obtain the same result." *Graver Tank, supra,* 339 U.S. at 608, 70 S.Ct. at 856; *Kinzenbaw v. Deere & Co.,* 741 F.2d 383, 389 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985). Thus the patentee is protected from clever copyists who duplicate the essence of the invention while skirting the language of its patent's claims. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983).

 However, patent law also recognizes that a patentee cannot be permitted to use the doctrine of equivalents to expand the scope of the patent's claims to cover structures which could not have been patented. If a patent applicant submits a broad claim which he is forced by the Patent Office to narrow in order to avoid anticipation or interference from another patent, the patentee is not permitted to use the doctrine of equivalents to recapture the ground abandoned in narrowing the claim. It is here that the doctrine of prosecution history estoppel comes into play. In its purest form, the doctrine estops a patentee

from reclaiming, through the doctrine of equivalents, coverage of devices which the patentee has expressly amended his claims to avoid. *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.,* 743 F.2d 1581, 1583 (Fed.Cir.1984). Stated more generally, the doctrine "precludes a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during the prosecution of his patent application." *Hughes Aircraft Co. v. United States, supra,* 717 F.2d at 1362. *See also Brenner v. United States,* 773 F.2d 306, 307 (Fed.Cir.1985). Thus the doctrine may be invoked if the applicant has disavowed subject matter coverage by arguing a narrow claim construction to the Patent Office as well as when he or she has disavowed subject matter through amendment. *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 900 (Fed.Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 1579–80 (Fed.Cir.1983); *Hughes Aircraft Co. v. United States, supra,* 717 F.2d at 1362; *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1117 (Fed.Cir.1983) (Davis, J., dissenting in part); *Coleco Industries, Inc. v. ITC,* 573 F.2d 1247, 1257 (C.C.P.A.1978).

Estoppel by argument rests on the same theoretical footing as the more classic estoppel by amendment. Ordinarily estoppel by argument arises when an applicant has convinced an initially skeptical patent examiner that the literal language of a claim does not encompass forbidden prior art. In such situations, estoppel by amendment cannot arise, for the applicant has convinced the examiner that amendment to avoid the prior art is unnecessary. Nevertheless, the applicant has disclaimed the prior art as effectively as if he or she had actually amended the patent's claims. Therefore, it is reasoned, the applicant should not be permitted to recapture that which has been abandoned.

Because the "argument" which forms the basis for estoppel by argument is ordinarily a statement that the literal reach of

an applicant's claims does not cover a particular subject matter, it might seem that a finding that a particular accused device cannot be claimed as an equivalent because of estoppel by argument would *a fortiori* mean that the device did not literally infringe the patent's claims. However, it has been held that subject matter which a patentee is estopped from claiming as an equivalent may nevertheless fall within the literal reach of the patent's claims. *Seattle Box Co. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 829 (Fed.Cir.1984). Defendant's request for summary judgment based on prosecution history estoppel is therefore a rather ambitious one. Even if plaintiff is estopped from claiming defendant's device as an equivalent, plaintiff would appear to be permitted under *Seattle Box* to prove literal infringement. *See also Fromson v. Advance Offset Plate, Inc., supra,* at 1571 ("If there be literal infringement, direct and contributory (as there may be here under a proper construction of the claims), the doctrine [of prosecution history] is irrelevant."). Indeed, in its cross motion plaintiff makes just that claim of literal infringement. Nonetheless, in order that all aspects of the case be dealt with, I shall first consider defendant's motion.

### IV. *Defendant's Motion*

Defendant's presentation of its estoppel motion is at best scattershot. It has made no attempt to organize a series of discrete, well reasoned arguments centered around specific events in the prosecution history. Instead, defendant has chosen simply to recite a detailed history of the prosecution

and highlight occasions on which plaintiff made statements which tend to distinguish the Slater invention from the accused device. I have sorted through what appear to be defendant's arguments, and I present a discussion of what I consider to be the most significant ones below.

### A. *Estoppel by Amendment*

 Defendant has little to argue in connection with estoppel by amendment. As noted above, claim one of the '854 patent, the only independent claim[5] amended in response to an examiner's objections, appears only slightly amended from its initial configuration in the 1971 application. When the 1971 application was initially submitted, the examiner rejected it as anticipated by prior art. One of the prior art patents cited, to Bengtson, U.S. Patent No. 2,940,782, was a means for fastening knobs—for example, radio or television dials—to their shafts. Bengtson's fastener is a flat metal spring clip designed to hold a knob in place on a D–shaped shaft by pressing between the flat side of the D and the inside surface of the mounting hole in the knob. The knob thus held can be readily pulled off, since only the friction between the spring clip and the flat side of the shaft holds it in place. In addition, the clip is not firmly fixed in the knob, for it is essentially wedged between the shaft and the inside of the knob. Bengtson's knob and two views of his clip are illustrated in Figure 7, which reproduces drawings taken from the patent.

---

5. Like most patents, the '854 and '862 patents set out initial "independent" claims of broad scope followed by a series of more narrow, specific claims. The narrower claims, referred to as "dependent" claims, refer back to and particularize the broader independent claims. Dependent claims contain all of limitations of the independent claims upon which they depend plus additional limitations of their own. The distinction is important, for it is a "fixed" rule of law enjoying "an immutable and universally applica-

ble status comparatively rare among rules of law" that the narrower, dependent claims cannot be read into the broader, independent claims so as to limit the scope of the latter. *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1574 (Fed.Cir.1985). It is a corollary of this that if a device does not infringe an independent claim it will not infringe any dependent claim of that independent claim, for all dependent claims cover narrower subject matter subsets of the matter covered by the independent claim.

Figure 7

Such an arrangement may be distinguished from the clip in plaintiff's invention in two ways: 1) once installed, plaintiff's clip is held firmly in place, and 2) the screw, equivalent to the Bengtson shaft, is also held firmly in place. As described above, once plaintiff's clip is installed, one of its prongs abuts against a fixture (a ridge in the illustration) in the outlet box, preventing its removal, and the screw may not be removed except by turning. Plaintiff argued this distinction to the claims examiner, and it amended its claim to reflect these distinctions.[6] Plaintiff's comments to the examiner reflect this logic. (1971 application, at 31–32).[7] Because defendant's device shares with plaintiff's the features which plaintiff sought through these amendments to distinguish from the prior art, the amendments could be of no help to defendant. Because they are the only significant amendments,[8] defendant cannot argue estoppel by amendment.

### B. *Estoppel by Argument*

In seeking to invoke estoppel by argument, defendant cites a number of characterizations which plaintiff made of its invention in the course of responding to the

examiners' many objections to its claims. Each of these characterizations is said to distinguish plaintiff's invention not only from the prior art but from defendant's device as well. It is these characterizations which defendant claims as a basis for estoppel. Before discussing this contention, I will review the various remarks in context.

The prior art patent which was most forcefully cited against the 1971 application was Bengtson. As noted above, plaintiff distinguished Bengtson by noting that the clip there disclosed was not locked in place inside the knob, whereas its clip was firmly fixed in the outlet box, and gripped the shaft only by friction, whereas plaintiff's clip prevented the screw from being removed by solely a pulling (non-twisting) force. Plaintiff amended its claims to distinguish Bengtson in this manner. At the same time, plaintiff noted that Bengtson did not provide for the specific means for locking the clip in place which plaintiff selected, that is, a narrow ridge gripped on both sides by the clip. This feature, while not specifically disclosed in claim one of the 1971 application, was disclosed in dependent claims three and five of the application. Defendant argues that this statement should limit plaintiff's invention to use of such a ridge, which it argues its device does not contain.

In addition, in the later 1973 application, plaintiff also distinguished the complexity of manufacture of its clip from that of Bengtson's clip, which contains a number of bends. Referring to formation of Bengtson's clip as involving "complicated twisting and bending," plaintiff noted that its clip is "based on a mechanically simple

---

**6.** Specifically, it changed the description of the effect of the prong engaging the screw from "resisting outward ... movement" to "preventing outward ... movement" and changed the description of the prong holding the clip in place from "mounting said clip" to "locking said clip." *See* notes 2 and 3, *supra.* Dependent claim three was also amended, but any limitation on this claim cannot be read into the broader independent claim. *See* note 5, *supra.*

**7.** I will use this shorthand to refer to citations to the application prosecution files, copies of which were helpfully paginated by defendant's counsel and submitted as exhibits to the instant motion.

**8.** Plaintiff also amended the claim by inserting the word "slidably" into claim one. *See* notes 2 and 3, *supra.* This was apparently not done in response to a specific examiner objection, and defendant does not argue that it has significant estoppel effect.

design which does not require complicated bends for fabrication." (1973 application, at 47). Defendant is apparently of the opinion that manufacture of its clip is not similarly uncomplicated.

The second set of allegedly limiting statements was also made in pursuing the 1973 application. The examiner cited several more patents against the 1973 application, among them a patent to Tinnerman, U.S. Patent No. 2,528,675. Tinnerman disclosed a fastening device which, like plaintiff's, was formed from sheet metal and gripped the threads of a screw by means of prongs. Unlike plaintiff's device, however, Tinnerman's is cylindrical rather than clip-like. It encircles the screw like a sleeve, presenting a distinctly different appearance. Illustrations from the patent are included as Figure 8.

Figure 8

Tinnerman's cylinder, like Bengtson's clip, was designed to anchor rubber or plastic knobs. Tinnerman's fastener, however, was meant to be molded into the knob as the knob was formed, thus fixing it permanently within the knob. In this it differs from plaintiff's and Bengtson's clips. In order to fix the Tinnerman fastener in the knob, flat ears, numbered 15 in Figure 8, are stamped perpendicularly from the cylinder. These ears become imbedded in the knob material during its formation.

The examiner cited Tinnerman only against claims five and eight of the 1973 application, not against independent claim one. Claims five and eight disclosed the new embodiment which was added in 1973 to accompany the embodiment illustrated in Figures 1–3, *supra*. The clip from this embodiment is illustrated in Figure 9.

Figure 9

Outward movement of this clip is prevented by the tabs numbered 121. Inward movement is prevented by the ears, numbered 122, which rest in seats molded on either side of the clip-receiving slot. The examiner claimed that the ears were obvious in light of the somewhat similar perpendicular projections on the Tinnerman device.

In attempting to persuade the examiner that its device was significantly different from Tinnerman's, plaintiff characterized its clip as "a substantially two-dimensional device capable of easy fabrication." Plaintiff distinguished its clip's means of securing itself within the outlet box from Tinnerman's perpendicular ears by noting that "Applicant's ear members 122 ... are projections forming an integral part of the clip member without any bending required for their formation. Also, the structure disclosed by Tinnerman teaches that any axially restraining members be oriented perpendicular to the body of the clip member. Thus, if used in Applicant's invention, the substantially two-dimensional character thereof would be lost." (1973 application, at 49). Defendant now argues that its device is not "substantially two-dimensional" and requires a bend to create its restraining tabs, thus differentiating it from plaintiff's invention as then characterized.

Finally, in submitting the 1977 application, plaintiff distinguished several prior art patents. This was not done in response to an examiner's objection [9] but apparently in order to assure that the references distinguished were brought to the attention of the examiner. This time plaintiff distinguished Tinnerman by noting that it had "no detent member projecting through a slot as claimed by Applicant." (1977 application, at 47). "Detent member" here refers to the prong which engages the screw; "slot" refers to the passageway which connects the borehole to the slot into which the clip is inserted. The prong projects through this passageway to engage the screw. Defendant claims not to have such a slot.

In the 1977 application plaintiff also distinguished, *inter alia*, three similar patents covering devices used to secure knobs to shafts by means of a clip of bent resilient sheet metal. An illustration of a representative of these patents, to Murphy, U.S. Patent No. 2,180,929, is seen in Figure 10.

Figure 10

In each of these patents, the clip is firmly affixed to the knob. One end of the clip is flexibly bent to block the shaft-receiving hole in the knob, but a D–shaped hole is cut from this end. A D–shaped shaft is inserted through this hole and into the hole in the knob. Because the end of the clip from which the hole is stamped engages the shaft at an angle, the clip tends to grip the shaft, thus securing the knob to the shaft. Plaintiff distinguished these fasteners by noting that they did not use a prong to secure the shaft, as its device did the screw, and that "in addition, the fasteners are formed with leg members having an aperture into which the shaft is inserted," that is, the shaft is inserted through a hole in the clip, a feature plaintiff's device does not share. (1977 application, at 46). Once again, defendant argues that this characterization distinguishes plaintiff's invention not only from the allegedly conflicting patents but from its device as well.

In considering the following discussion of these various statements, it is important to bear in mind the purpose of the doctrine of prosecution history estoppel: to prevent a patent owner from "resurrect[ing] subject matter surrendered during prosecution of his patent application." *Hughes Aircraft, supra*, 717 F.2d at 1362. In other words, if during the prosecution of a patent an applicant is forced to admit, "my invention is not that," he may later be estopped from claiming that the invention is that. What is important, therefore, is the device which the patentee disclaims. As a result, proper application of the doctrine demands that the court focus more on the subject matter that was surrendered than on the language used to surrender it.[10]

Defendant first notes that in distinguishing Bengtson plaintiff asserted that Bengt-

---

**9.** The examiner's only objection to the 1977 application was that it was anticipated by Pringle. Plaintiff resolved this by pointing out the 1977 application's roots in the 1971 application, which pre-dated Pringle.

**10.** In evaluating the estoppel effect of these statements, I have not distinguished among them on the basis of the examiner to which they were made. Although the examiner of the 1971 and 1973 applications ultimately did not accept

many of the arguments, all of the arguments were nevertheless before the 1975 and 1977 examiners who granted the patents at issue. I will presume that these later examiners considered and accepted these arguments, although it is impossible to know whether they actually did. Thus plaintiff may be bound by all of them without regard to the examiner to which they were made.

son did not have "an intermediate shoulder having opposite side walls extending across a slot" (i.e., the ridge numbered 10 in Figure 3) for fixing the clip in place. Defendant argues that because plaintiff sought to distinguish Bengtson in this way, it ought to be restricted to claiming an invention possessing that particular means for fixing the clip. Whatever the merits of such an approach to estoppel, focusing not on the thing disclaimed but on the way in which it is disclaimed, it cannot work here. Examination of the prosecution history shows that plaintiff cited claims three and five immediately after noting this characteristic. Both claims, as well as claim one, were rejected by the examiner as anticipated by Bengtson. The ridge, which is not disclosed in claim one, the independent claim of the application, is specifically disclosed in claims three and five. It is clear, therefore, that in citing the ridge plaintiff was not attempting to distinguish the invention as a whole from Bengtson. Rather, it was distinguishing the invention as particularized in claims three and five.

 It is a fundamental rule of patent claim construction that limitations on inventions found in dependent claims are not to be imposed upon the invention as disclosed in the independent claims. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985). A natural corollary of this principle is that arguments which rely upon such limitations to distinguish prior art from the invention as disclosed in dependent claims cannot be used to estop a claim of equivalence to the invention as disclosed in the independent claims. Dependent claims are by definition narrower claims than independent claims. Distinguishing arguments concerning dependent claims are thus available to the applicant which would narrow the scope of the invention significantly if applied to the independent claims. It would be unfair to force the applicant to choose between foregoing

these legitimate arguments and accepting an otherwise unnecessary narrowing of the whole invention. Therefore, I find the comment cited to create no estoppel except as to infringement of claims three and five. Since plaintiff claims no such infringement, the statements are of no effect in this action.

The statements regarding Bengtson in the 1973 application, in contrast, did refer to the invention as disclosed in the independent claim. Plaintiff argued to the examiner that manufacture of Bengtson's clip required "complicated twisting and bending," in comparison with its own clip's simple fabrication. (1973 application, at 47). This statement appears to be an appropriate candidate for estoppel effect. Plaintiff claimed that formation of the Bengtson clip required complicated bending, while fabrication of its clip did not, and that this difference had a significant impact upon plaintiff's invention's patentability. It can be estopped now from taking a contrary position.

It is important to clarify, however, the precise effect of the statement. As noted above, what is significant is not necessarily the words used to disclaim but the subject matter disclaimed. In disclaiming Bengtson's clip, plaintiff was not disclaiming all clips which require bends for their manufacture, but only clips requiring bending of approximately the degree of complexity of Bengtson's clip. Therefore, in order to use this statement to estop plaintiff from claiming defendant's clip as equivalent to its own, defendant must convince the trier of fact that its clip is closer in complexity of manufacture to Bengtson's clip than to plaintiff's. Contrary to defendant's apparent impression, the mere fact that its clip contains more bends than plaintiff's clip alone provides no ground for estoppel. Summary judgment is plainly inappropriate.[11]

---

11. At the beginning of its response to the patent examiner's objections, plaintiff also characterized its clip as "substantially two-dimensional." (1973 application, at 45). Defendant seeks now to use that statement as a basis for estoppel.

The statement, however, was not made in response to any specific examiner objection. It was not intended to disclaim any specific subject matter. Therefore, it would be inappropri-

The next set of statements which defendant seeks to use were made in connection with Tinnerman's cylindrical device. It is important to note that the examiner did not cite Tinnerman as anticipating claim one, the independent claim, but claims five and eight, the two dependent claims disclosing the embodiment which uses the clip illustrated in Figure 7, *supra*. Further, the response which defendant seeks to use is keyed directly to the clip used in that embodiment. Plaintiff refers in its discussion to "ear members 122," which, it claimed, are distinguished from Tinnerman by the fact that they do not require any bending for their formation. It could not be more clear that it is the clip seen in Figure 7, rather than the invention as disclosed in the independent claim, which plaintiff is referring to as "substantially two-dimensional." As explained above, arguments made in connection with dependent claims cannot be used to estop a claim of equivalence regarding the independent claim from which they depend—at least, as is the case here, so long as the arguments are clearly based on structures disclosed in the dependent claim but not in the independent claim. Therefore, the 1973 statements cited by defendant which were made in connection with Tinnerman cannot serve as a basis for estoppel.

Defendant also cites certain statements from the 1977 application. The first derives from plaintiff's attempt to distinguish Tinnerman by noting that it "has no detent member projecting through a slot." (1977 application, at 47). As described in necessarily tedious detail *infra* at 466–467, defendant contends that its device does not have a detent member projecting through a slot but rather a detent member situated in a D-shaped hole. The difference is not functional but turns merely upon the shape of the hole and slot arrangement; plaintiff's slot could be made into a D-shaped hole by widening the slot. Regardless, defendant argues that because plaintiff stated that it possessed a slot rather than a D-shaped hole, it should be estopped from

claiming that the D-shaped hole is equivalent to its slot.

I cannot accept the argument. It must be remembered that the focus in prosecution history estoppel is on the subject matter disclaimed, not on the language used to disclaim it. In noting that its invention used a detent means projecting through a slot, plaintiff sought to differentiate its invention's means for securing a screw from Tinnerman's. The means used by Tinnerman is thus plainly disclaimed. Defendant's means, however, is nothing like Tinnerman's. Further, it is functionally and nearly structurally identical to plaintiff's means. There is no reason to think that plaintiff intended to, or needed to, disclaim it, even if plaintiff's specific disclaiming language could arguably be construed as doing so. Therefore, with regard to defendant's device, I find no ground for estoppel in the statement.

Finally, in distinguishing the Murphy and similar patents, plaintiff noted that Murphy's "fastener" had an aperture through which the shaft passed, which its invention does not. Defendant points out, quite rightly, that its clip has such an aperture. It claims that on the basis of this statement plaintiff should be estopped from claiming the two to be equivalent. However, despite the superficial resemblance, I find the statement to be irrelevant to defendant's device. Plaintiff specified that Murphy's "fastener" had an aperture. This statement follows a reference to plaintiff's detent member projecting through a slot, i.e., its means for securing the shaft. It is quite clear that "fastener" in the context refers to the respective devices' means for securing the shaft. The distinction that plaintiff sought to make with Murphy, therefore, was that while plaintiff secures its shaft by means of a thread-engaging prong, Murphy uses a clip with a hole in it. Since defendant uses a thread-engaging prong similar to plaintiff's, the statement regarding Murphy in no way differentiates

ate to use it as a basis for estoppel, and I will

not permit it to be so used.

defendant's and plaintiff's devices. It provides no ground for estoppel.[12]

▮ To summarize, defendant has produced only one statement from the prosecution history which may be applied to estop plaintiff from claiming that defendant's device is equivalent to its own. The remainder of the statements I find, for the various reasons stated above, to be irrelevant to the issue of whether defendant's device can be found equivalent to plaintiff's invention. Because the statement which could have estoppel effect does not plainly preclude a finding of equivalence, an issue of fact is created. Summary judgment is inappropriate, and defendant's motion is denied. This might require trial on the issue of infringement *unless* plaintiff succeeds on its cross motion for *literal* infringement, to which I now turn.

### V. *Plaintiff's Cross Motion*

▮ Plaintiff has cross-moved for summary judgment of literal infringement. Literal infringement is found if an accused device falls clearly within the terms of the patent's claims as properly interpreted, *Envirotech Corp. v. Al George, Inc., supra,* 730 F.2d at 759, and the structures of the accused device "do the same work, in substantially the same way, and accomplish substantially the same result" as those of the patented device. *Autogiro Co. of America v. United States,* 384 F.2d 391, 399–400, 181 Ct.Cl. 55 (1967), *quoting Dominion Magnesium Ltd. v. United States,* 320 F.2d 388, 396, 162 Ct.Cl. 240 (1963). *See also Catepillar Tractor Co. v. Berco, S.P.A., supra,* 714 F.2d at 1115 n. 3. "Properly interpreted" is a key phrase here. The infringment inquiry may be broken into two steps: first the scope of the claims must be ascertained, i.e., they must be "interpreted," and then the trier of fact must determine whether the claims as interpreted cover the accused device. *Envirotech Corp., supra,* 730 F.2d at 758. While it is often said that claim construction is a question of law for the court, recent Federal Circuit cases restrict the interpretive role of the court to determining whether the meaning of the language of the claims is disputed:

Construction of a claim, a question of law, is necessary to define the metes and bounds of the protection afforded by the claims. If the language of a claim is not disputed, then the scope of the claim may be construed as a matter of law. *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 221 USPQ 945 (Fed.Cir.1984), *cert. denied,* [469 U.S. 1037] 105 S.Ct. 514 [83 L.Ed.2d 404] (1984). But when the meaning of a term in the claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises, and construction of the claim should be left to the trier or jury under appropriate instruction.

*Palumbo v. Don-Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985). Thus summary judgment of infringement cannot be granted when a genuine dispute exists as to the meaning of the terms of a claim.

▮ The meaning of the words in a claim must be determined from all the circumstances which surrounded their formulation. It is frequently said that words in a claim should be given their ordinary meaning, *e.g., Envirotech Corp., supra,* 730 F.2d at 579, but it is also the law that "patentees are not confined to normal dictionary meanings." *Fromson v. Advance Offset Plate, Inc., supra,* 720 F.2d at 1569. Therefore, the language of a claim should always be construed not only with regard to its literal meaning but also to its con-

---

12. Plaintiff also argues that because Murphy, as well as several other prior art devices, uses a D-shaped hole, plaintiff should be estopped from claiming a D-shaped hole to be equivalent to its hole and slot arrangement. Nowhere, however, does defendant cite any statement from the prosecution history in which plaintiff specifically distinguishes a D-shaped hole from its own structure. There is thus no ground for estoppel. Defendant points to the statements connected with plaintiff's efforts to distinguish Murphy, but it is quite clear that the shape of the hole was entirely irrelevant to plaintiff's efforts to distinguish Murphy. Defendant's further argument that plaintiff's patent would be invalid if it were taken to include a D-shaped hole I find irrelevant on this motion.

text. "Context" here takes in the patent specification, the other claims of the patent, the prosecution history of the patent, and "the circumstances surrounding the inception of the patent application." *Fromson v. Advance Offset Plate, Inc., supra,* 720 F.2d at 1569, *quoting Autogiro Co., supra,* 384 F.2d at 397; *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 672–675 (Fed. Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). Care must be used, however, in looking to the specification and other claims to define the scope of any particular claim, for limitations found in the specification or in dependent claims are ordinarily not to be read into independent claims. *Environmental Designs, Ltd. v. Union Oil Co. of California,* 713 F.2d 693, 699 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 1043, 79 L.Ed.2d 173 (1984). "That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 957 (Fed.Cir.1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984). Courts are not to limit the claimed invention to the preferred embodiment or to specific examples listed in the specification. *Lemelson v. United States,* 752 F.2d 1538, 1552 (Fed.Cir.1985). *See also, J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1563 (Fed.Cir.1984).

Because a determination of infringement is a finding of fact, motions for summary judgment of infringement must be approached with caution. *Palumbo v. Don-Joy Co., supra,* 762 F.2d at 973. Nevertheless, a finding of summary judgment of infringement is appropriate when a defendant fails to demonstrate the existence of a genuine issue of fact as to infringement. *SAI Intern v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed.Cir.1985). In order to demonstrate a genuine issue of fact when opposing summary judgment on an ultimate issue of fact such as infringement, a party must present a position sufficiently plausible to be adopted by a reasonable jury. *See* Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issue of Material Fact,* 99 F.R.D. 465, 486–87 (1984).

### A. Claim One of the '862 Patent

Plaintiff first argues infringement of claim one of the '862 patent, a claim adopted from the Pringle patent over which plaintiff was awarded an interference.[13]

Claim one reads as follows:

What is claimed is:

1. An electrical junction box comprising:

a unitary molded plastic enclosure having a bottom and upstanding opposite side and end walls defining an open face at their upper ends; and

boss means on said box at opposite walls for mounting a bracket to said box, said boss means housing quick fastener means for reception of a threaded fastener,

said boss means including a passageway and internal abutment means at said passageway and said quick fastener means comprising insert means in said passageway including means engaging said internal abutment means and means for engaging a threaded fastener,

said passageway including a slot generally parallel to an enclosure wall and said insert means comprising a relatively thin metal clip receivable in said slot having oppositely bent tabs, one of said tabs adapted to engage a threaded fastener.

Defendant attempts to avoid the reach of these claims at every point possible. Many of defendant's arguments consist of nothing more than elaborate assertions that defendant's device does not look

---

**13.** Although plaintiff claims infringement of several of the '854 and '862 claims, on this motion it seeks to demonstrate infringement only of the most general claims in the patents, the two independent claims of the '862 patent and the single independent claim of the '854 patent.

exactly like the preferred embodiment in plaintiff's patent. When applied to structural claims, such an argument impermissibly attempts to limit the invention to the preferred embodiment. *Lemelson v. United States, supra,* 752 F.2d at 1552. When applied to "means plus function" claims, in which what is claimed is a general means for accomplishing a specified purpose, such an argument ignores the text of 35 U.S.C. § 112, which expressly extends the literal coverage of a means plus function claim not only to the specific structure described in the specification but to "equivalents thereof." *See Palumbo v. Don-Joy Co., supra,* 762 F.2d at 974.

I find defendant's contention that its outlet box does not contain a "boss means ... for mounting a bracket" to fall within this category, as well as its arguments that its boss means does not include "a passageway including a slot" and that its quick fastener has no "means engaging said internal abutment means." Because these arguments all impermissibly attempt to restrict the patent, I find no merit in them and will not discuss them further.

■ Nor do I find any merit to defendant's argument that its clip (the object referred to as an "insert means" in claim one) is not "a relatively thin metal clip," as required by the claim. The argument seems to be premised upon the fact that defendant's clip contains a right angle bend, producing an "L" shape, whereas plaintiff's clip is more or less flat. To state the argument, however, is to reveal its flaw: that the T–B clip is not flat does not

mean that it is not thin. An example is helpful. As defendant itself points out, Webster's Dictionary defines "thin" as "having little extent from one surface to its opposite (paper)." The focus is on thickness, not shape. Bending a thin sheet of paper at a right angle may cause the page to cease to be flat, but it does not cause it to cease to be thin. Bends are irrelevant to thinness. Because it is stamped from thin sheet metal, defendant's "insert means" indisputably qualifies as a "relatively thin metal clip." [14]

The next issue addressed in the motion papers is the claim's description of the "internal abutment means" which engages the "insert means." Both defendant's device and plaintiff's preferred embodiment contain an abutment on the inside of the boss which engages the clip. These are the plastic structures numbered 10 in Figure 3 (plaintiff's device) and numbered 3 in Figure 6 (defendant's device). Each abutment creates a ridge against which a tab on the clip rests to prevent outward movement of the clip when a screw is tightened against the clip's other tabs. Plaintiff's abutment also prevents inward movement of the clip; inward movement of defendant's clip is prevented by an indented abutment around the top of the boss rather than by the abutment numbered 3.

Claim one does not specify merely an internal abutment but an "internal abutment means." It is presumably meant to be a means plus function claim. Plaintiff's claim of infringement is implicitly premised upon the argument that the proper func-

---

**14.** At this point in its argument, defendant also attempts to use certain statements from the prosecution history of plaintiff's patents to bolster its arguments. Before proceeding to a discussion of these statements, I think it is best to review the function of prosecution history in interpreting patent claims. The aim of the interpreter is to figure out what the terms in the claim were understood to mean by the patentee and the claims examiner, for this is their legal meaning. Statements to the examiner about the invention made during the application process are helpful in interpretation to the extent that they aid the interpreter in figuring out what the patentee and examiner meant by the language on which they eventually settled.

The specific references come from the prosecution of the 1973 application. In distinguishing the Tinnerman patent, as described in the text, *supra,* at 453–454, plaintiff referred to its clip as "substantially two-dimensional" and as lacking "complicated bends." I am at a loss, however, to see the relevance of these statements to the issue of whether plaintiff's clip is "thin." The claims in the 1973 application did not describe the clip as thin; this description was not added until the 1975 application. Therefore, the statements cannot possibly shed light on what the patentee and examiner had in mind when describing the clip as thin.

tion of the internal abutment is solely to prevent outward movement of the clip. Plainly both devices have internal abutments which perform that function. Conversely, defendant's claim of noninfringement is premised upon an argument that the proper function of the internal abutment is to prevent inward movement of the clip. It argues that the abutment on the outside face of its boss which prevents inward movement is external rather than internal and thus does not satisfy the claim's requirement.

Neither of these functions, of course, is specified in the claim itself, which requires of the abutment only that it be located "at" the "passageway," i.e., at the hole and slot which receive the clip and screw, and that it "engag[e]" the clip. Despite its statement as a means plus function claim, no function is specified for the internal abutment means. It is, therefore, appropriate to inquire into the history and circumstances of the claim to discern the function which the patentee and patent examiner intended for the abutment.[15]

The following structure is the most helpfully representative of those disclosed in the Pringle patent:

Figure 11

This is another variation on the clip-and-hole theme embodied in plaintiff's and defendant's screw-retaining structures. The clip, numbered 98 in Figure 7, fits into the slot, numbered 94. A prong, numbered 99, engages the screw. A second prong, numbered 100, abuts a shoulder, numbered 12, to prevent outward movement of the clip,

15. As noted above, this claim was borrowed from the Pringle patent. Therefore, resort both to the history of that patent and to the interference which became the '862 patent is appropriate to determine the precise structure and function designated by "internal abutment means." Defendant strenuously objects that use of the Pringle patent history is improper, but it gives no principled reason for opposing such use. The aim of interpretation is determining what the patentee and examiner meant. Because the Pringle history contains indications of what was meant by this language, its use is appropriate.

while the lower edge of the clip sits in the bottom of the slot, numbered 11, to prevent inward movement of the clip.

Plaintiff contends that the shoulder, numbered 12, is this structure's internal abutment means; defendant contends that the internal abutment means is the bottom of the slot, numbered 11. Plaintiff's argument leads to the conclusion that the function of the "internal abutment means" is to prevent outward movement of the clip; defendant's to the conclusion that the function is to prevent inward movement.

I conclude that plaintiff is correct. The shoulder urged by plaintiff is plainly an abutment at the passageway, and it engages the clip. It satisfies the claim's elements. Although defendant objects that this structure cannot possibly be the *internal* abutment means because it occurs on the *external* face of the outlet box, that part of the shoulder which engages the clip is inside the external face of the wall of the box, numbered 14. It is only slightly inside, but it is internal, not external.

More importantly, other factors demonstrate conclusively that, whatever imprecision may exist in the language, this shoulder is the structure to which the patentee was referring by the term "internal abutment means." First, in the specification of the Pringle patent, which nowhere refers expressly to an internal abutment means, the clip is spoken of as "engaging" the shoulder. The claim, of course, specifically refers to the internal abutments means as being engaged by the clip. Because the shoulder is the only structure to which the specification refers as being so engaged, it may be inferred that this structure is equivalent to the internal abutment means. Second, in claim one as originally filed in the Pringle application the word "shoulder" occurred in place of "internal abutment means." The latter was substituted in response to an examiner's concerns over the claim's wording.[16] It is clear that "shoul-

der" and "internal abutment means" were intended to be synonymous.

Both of these factors demonstrate beyond doubt that the shoulder of the Pringle patent was envisioned by both the patentee and the Patent Office as the internal abutment means. Therefore, it cannot be denied that the intended function of the internal abutment means was to prevent outward movement of the clip.

Defendant, however, contends that the internal abutment means was also intended to prevent inward movement. In support of this position, it argues that the bottom of the clip-receiving slot is also an "internal abutment means." It points out that the bottom of the slot is internal and abuts and engages the clip, thus satisfying the elements of the internal abutment means listed in the claim.

I cannot accept that argument in the face of the fact that, beyond peradventure of doubt, both the patentee and the Patent Office regarded the shoulder as the "internal abutment means" forming a part of the patented device. Defendant cannot be heard to argue that additional "internal abutment means" may have been in the contemplation of those interests when it is clear they were not.

More specifically, it is equally clear that the patentee and Patent Office did not intend the bottom of the slot to be part of the internal abutment means. In the specification and drawing of this embodiment in the Pringle patent the bottom of the slot is neither mentioned nor illustrated. The dotted lines in Figure 11 which describe this bottom were drawn in for purposes of this litigation by defendant to illustrate a structure which Pringle overlooked, although both parties agree it must exist. It seems unlikely that the applicant would fail both to mention in the specification and to illustrate a structure to which it meant specifically to refer in the claims. In addition, as noted above, the claim as originally filed referred to the shoulder, numbered 95, and

---

16. Because the change was not made to correct an objection based upon prior art, no estoppel arises.

the internal abutment means as synonymous. No mention was made of this other structure.

Additionally, in pursuing its interference with the Pringle patent, plaintiff was required to demonstrate how its invention satisfied each element of the Pringle claim. In discussing its clip's "means for engaging said internal abutment means," plaintiff referred only to its clip's capacity for preventing outward movement by engaging the ridge. The Patent Office apparently accepted this reference as being adequate to satisfy the requirements of the internal abutment means. Plaintiff argues that this acceptance indicates that the Patent Office considered the means for preventing outward movement as equivalent to the internal abutment means.

These factors, singly and in combination, demonstrate that patentee and examiner viewed the shoulder as the only structure responding to the description "internal abutment means." Accordingly plaintiff's claim reads on defendant's device, and literal infringement is present.[17]

Lastly, defendant focuses on the requirement in claim one that the clip have "oppositely bent tabs." A glance at defendant's clip shows that it has tabs which point in opposite directions, a fact which it acknowledges. However, defendant contends that the phrase refers not to tabs pointing in opposite directions, but tabs bent from opposite sides of the clip, as seen in the Pringle and Slater embodiments. Defendant's device does not possess such tabs.

Defendant's position is supported primarily by two arguments. The first derives from the language of the claim itself. The claim does not describe the tabs as oppositely "pointed" but oppositely "bent." As defendant points out, the state of being bent is a result of the process of bending. It is argued that these tabs are not oppositely "bent," for the forces which caused them to bend (and thus to be bent) acted in the same direction, from one side of the clip to the other. As a consequence, the tabs as they were bending moved in the same direction away from the plane of the clip. Their differently pointing tips thus result not from their being oppositely bent but from their being hinged at opposite ends. In other words, it can be sensibly argued that they are similarly bent but oppositely hinged. This distinguishes them from certain of the tabs on the Slater clip, in which the bending forces are of necessity applied from opposite sides of the clip. These tabs are both oppositely hinged and bent.

Defendant also focuses on the patent specification and prosecution history. In arguing its interference with Pringle, plaintiff continually used the word "opposite" when it referred to the manner in which the tabs of its clip extend from opposite sides of the clip. While this is not conclusive, it does tend to indicate that the patentee and the Patent Office viewed "oppositely bent tabs" as referring to tabs bent from opposite sides of the clip rather than pointing in opposite directions.

Plaintiff's first response is not persuasive. It points out that a clip possessing the characteristic of tabs projecting from opposite sides is specifically mentioned in a dependent claim of the '862 patent, claim ten. In claim ten, the tabs are referred to as extending from opposite sides of the clip. It argues that under the principle of claim differentiation this limitation cannot be read into the broader independent claim. This argument misapprehends the principle.

It is true that claim differentiation prevents courts from reading into an independent claim limitations present in dependent claims. However, the principle of necessity applies only to limitations which, unlike the present limitations, are not already present

---

**17.** I recognize that the screw retaining device of necessity requires that the clip abut the boss in such a way as to prevent outward *and* inward movement. Plaintiff's claim describes the clip as "receivable in said slot," thereby casting the slot in the role of the clip's receptacle. A ridge placed to the side of the slot prevents inward movement of the clip. Nothing in these considerations operates to expand the definition of "internal abutment means" beyond the shoulder preventing outward movement.

in the independent claim. The court can hardly read a limitation into a claim if the limitation is already present. Further, the principle cannot be applied to read out a limitation from an independent claim solely because the limitation is present in a dependent claim. Nor does the presence of similar language in an independent and dependent claim automatically mean that the language in the independent claim has a broader meaning than that in the dependent claim. In short, the presence of oppositely extending tabs in claim ten cannot displace "oppositely bent" tabs from claim one, nor does it relieve the Court of the duty of interpreting the language of claim one.[18]

I am persuaded, however, by plaintiff's argument that the plain meaning of "oppositely bent" encompasses tabs formed so as to point in opposite directions. As support for its view that this was the meaning intended by the patentee, plaintiff points out that tabs which point in opposite directions are an essential element of its invention. One tab must point inward to resist the screw, while the other must point outward to resist outward movement of the clip. No other design is feasible.[19] As noted *supra*, the language of a claim must be interpreted with regard both to literal meaning and to context. Applying those criteria, I conclude that no genuine issue of fact exists.

### B. *Claim Two of the '862 Patent and Claim One of the '854 Patent*

Plaintiff also moves for summary judgment of literal infringement of claim two of the '862 patent and claim one of the '854 patent. Although the wording of these two claims is not identical, the parties seem to agree that the differences are not material. I will quote and refer to claim two of the '862 patent as representative of both. It reads as follows:

2. An electrical outlet box comprising:

a plastic enclosure having a bottom wall and a generally continuous sidewall member upstanding therefrom, said sidewall member defining, with said bottom wall, a generally hollow chamber;

at least one threaded-fastener mounting member formed on said sidewall portion, said mounting member including an unthreaded borehole adapted to receive a threaded fastener;

a first slot formed in each said mounting member, adjacent said borehole;

a second slot formed in each said mounting member adjacent said borehole and extending generally parallel thereto, said second slot being communicated with said borehole by said first slot,

a clip member slidably receivable in each said second slot, each said clip member including first detent means adapted to project through said first slot into said borehole when said clip member is seated in said second slot and to permit inward axial movement of a threaded fastener into said borehole yet prevent outward axial movement of the threaded fastener therefrom; and

means for slidably fixedly locking said clip member in said second slot.

T–B acknowledges that its device satisfies many of the elements of this claim. Slater has adduced evidence that it satisfies all of them. After reviewing the evidence and arguments of counsel, I find an issue of fact raised with regard only to one

---

18. Implicit in plaintiff's argument is the suggestion that the phrase "extending outwardly from the side ... opposite" must have a different meaning than "oppositely bent," since if they occur in the same patent and were intended to have the same meaning they would have been presented in identical language. If both claims had been penned by the same author, the argument would have great appeal. Claim one, however, was borrowed from Pringle, whereas claim ten was drafted by plaintiff. It is thus entirely possible that in drafting "oppositely

bent" the Pringle author had the same concept in mind as that described with more precision by plaintiff's language.

19. Plaintiff also argues, accurately, that nothing in the Pringle patent or its history indicates that "opposite" refers to extending from different sides of the clip and notes that this feature plays a less essential functional role than tabs pointing in opposite directions.

element; defendant's device satisfies the remainder.

Although defendant's counsel raises a number of arguments against infringement, most are without merit. Of these, I find it necessary to address only two. First, defendant has composed a list of attributes which it claims are shared by the embodiments of the "clip member" illustrated in the specifications of the '862 and '854 patents. It argues that because its clip shares none of these, literal infringement cannot be present. None of these attributes, however, is listed in the independent claims. Instead, defendant's is a rather bald attempt to limit the independent claims to the examples in the specification and to the embodiments, and it fails for that reason.[20] *Lemelson v. United States, supra,* 752 F.2d at 1552; *J.P. Stevens & Co. v. Lex Tex Ltd., supra,* 747 F.2d at 1563; *Raytheon Co. v. Roper Corp., supra,* 724 F.2d at 957; *Environmental Designs, Ltd. v. Union Oil Co., supra,* 713 F.2d at 699.

The second argument concerns an element which describes a characteristic of the clip, "means for slidably fixedly locking said clip member in said second slot." "Said second slot" is the narrow slot which holds the clip. The '854 patent presents two embodiments with different "means for slidably fixedly locking" the clip in its slot. The first, illustrated in Figures 1–3 above, consists of two prongs which grip either side of a ridge which runs across the slot. The second can be envisioned from the embodiment's clip, illustrated in Figure 9. In addition, because this is a "means plus function" claim, literal infringement extends to the "structure[s] ... described in the specification and equivalents thereof." 35 U.S.C. § 112; *Palumbo v. Don-Joy Co., supra,* 762 F.2d at 974. Plaintiff presents expert testimony that defendant's

clip is an equivalent of the structures described in the '854 and '862 patents.

Defendant contends that its means is not equivalent. As can be seen from Figures 4–6, defendant's clip slides into a narrow slot. When pushed far enough, the clip locks in place and cannot be readily removed. There is no question that it "slidably, fixedly" locks. The means for accomplishing this are the familiar tabs which grip a ridge, preventing outward movement of the clip, and two side flaps on the bottom leg of the "L," numbered 5 in Figures 4 and 5, which rest in parallel grooves in the top of the boss, preventing inward movement. Plaintiff's expert testifies plausibly that this means for locking the clip in place is equivalent to the means disclosed in the '862 and '854 patents.

Whether these means are equivalent is normally a question of fact. In response to plaintiff's expert's testimony, defendant's counsel does no more than declare, in conclusory fashion, that the two are not equivalent. However, Rule 56(e), F.R.Civ.P., requires that the party resisting summary judgment must set forth specific disputed facts requiring trial; it may not rest on mere allegations or denials. Arguments of counsel do not create an issue of fact. No evidentiary affidavit has been submitted to back up counsel's argument. Defendant's efforts therefore fail to create an issue as to infringement on this aspect of the case.

I do, however, find one issue of fact. One element of claim two is a boss or "mounting member" containing a borehole, "a first slot formed in each said mounting member, adjacent said borehole; [and] a second slot formed in each said mounting member adjacent said borehole and extending generally parallel thereto, said second slot being communicated with said borehole by said first slot." The hole, of course, receives the screw. One of the slots ("the second slot") holds the clip while the other

---

**20.** As noted above, I do not accept the argument that plaintiff's statements during its patent prosecution in any way estop it from claiming coverage of devices shaped differently from its own. Nor do I see anything ambiguous about the language of claim two of the '862 patent and claim one of the '854 patent which could, when

interpreted, lead to a finding that the embodiment clip illustrates the only possible structure which is described by them. On the contrary, I see nothing difficult or ambiguous about the language in the claim which describes the clip. The question of interpretation by reference to the history and specifications does not arise.

("the first slot") connects the clip-holding slot with the borehole. The prong which engages the screw projects from the clip through the first slot and into the borehole, where it contacts the screw.

The outline of the hole and slot arrangement of plaintiff's embodiment is shown in Figure 12.

Figure 12

Figure 13

The narrow slot, numbered 1, holds the clip. The prong projects through the slot numbered 2 into the hole, where it engages the screw. Defendant's device rather inevitably contains a similar structure, shown in Figure 13. The clip is held in the slot numbered 1, with the screw-engaging prongs of the clip extending through the opening, numbered 2, into what defendant labels a D-shaped hole.[21]

Defendant argues that its configuration contains no first slot connecting the clip-receiving second slot with the borehole—instead, it is argued, the borehole communicates directly to the second slot.

Plaintiff in effect concedes that the borehole of the T–B structure directly intersects the second slot. However, it points to the straight sides possessed by defendant's hole in the area where it intersects the slot. Plaintiff argues, plausibly, that this straight-sided configuration is precisely equivalent to a borehole connected to the second slot by a first slot having the same width as the diameter of the borehole. In other words, plaintiff argues that defend-

ant's device has a borehole connected to the second slot by a first slot so wide that the slot is indistinguishable from the hole itself. Both parties present drawings which they argue tend to support or undercut this characterization.

By making this argument of precise equivalence, plaintiff veers towards a doctrine-of-equivalents analysis. This particular claim does not present a "means plus function" issue under § 112, and so, on this aspect of the case, plaintiff cannot summon § 112 in aid of its claim of literal infringement. *See generally Palumbo v. Don-Joy Co., supra,* at 975 n. 4; *D.M.I., Inc. v. Deere & Co., supra,* at 1575.

Nevertheless, I do not regard summary judgment as unavailable to plaintiff on this claim. Although the Federal Circuit has urged caution in the granting of summary judgment in patent infringement cases, nonetheless it recognizes that the remedy may be appropriate when "a properly interpreted claim with an uncontested description of the accused device reflects the ab-

21. The shape of the borehole in defendant's device is not uniform along its length. For most of its length, it takes the shape described by the dotted lines on either side of the hole in Figure 13. It is more or less D-shaped. At the bottom of the hole, where the tabs which prevent out-

ward movement of the clip engage the boss, the two triangular projections described by the solid lines on either side of the hole in Figure 13 are molded on to the edges of the structure surrounding the hole, converting the hole to a "C" shape near its bottom.

sence of a genuine issue of material fact." *Palumbo v. Don-Joy Co., supra,* at 973. In *D.M.I., Inc. v. Deere & Co., supra,* the court said at 1573:

> It is at least conceivable that comparison of a properly interpreted claim with a stipulated or uncontested description of an accused device or process would reflect such an absence of material fact issue as to warrant summary judgment of infringement or noninfringement.

That conceivable situation is present in the case at bar. Plaintiff is entitled to summary judgment on the issue of infringement. The similarities between the structures here at issue raise the word "equivalent" to its highest power. On all aspects of the case but the last, plaintiff succeeds on the basis of literal infringement. To the extent that the last issue implicates the doctrine of equivalents, the collateral doctrine of estoppel, *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1115 n. 2 (Fed.Cir.1983), is not implicated because the only arguable basis for estoppel defendant has made relates to an entirely different structure (the bending and twisting of the clip).

I conclude that plaintiff is entitled to summary judgment of infringement because, for the foregoing reasons, there is no genuine issue as to a material fact, and plaintiff is entitled to judgment as a matter of law.

### Conclusion

Defendant's motion is denied. Plaintiff's cross-motion is granted. Settle order on ten (10) days' notice.

It is SO ORDERED.