SANDERS BRINE SHRIMP COMPANY, L.C., Plaintiff,

v.

BONNEVILLE ARTEMIA INTERNATIONAL, INC., Defendant.

No. 94–NC–085.

United States District Court, D. Utah, Central Division.

July 7, 1997.

---

Raymond J. Etcheverry, C. Kevin Speirs of Parsons Behle & Latimer, for Salt Lake City, UT, for Plaintiff.

Stephen T. Hard, Rebecca S. Parr of Giaugue, Crocket, Bendinger & Peterson, M. Reid Russell, Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

Oral Argument was heard on Defendant's Motion for Summary Judgment or in the alternative for Partial Summary Judgment and on Plaintiff's Cross–motion for Partial Summary Judgment. Plaintiff is represented by Raymond J. Etcheverry and C. Kevin Speirs of Parsons Behle & Latimer. Defendant is represented by Stephen T. Hard and Rebecca S. Parr of Giauque, Crocket, Bendinger & Peterson and M. Reid Russell. Being fully advised, the Court now enters its Memorandum Decision and Order.

## FACTS

This case arises from alleged patent infringement by Bonneville Artemia International ("BAI") of a patent owned by Sanders Brine Shrimp Company ("Sanders"), *i.e.*, the 4,839,062 patent (" '062 patent"). The patent generally covers a device and method of using a pontoon type floating device with a skimming apparatus for harvesting brine shrimp eggs naturally found in slicks at the surface of a body of water.

BAI employs a device and method for harvesting brine shrimp eggs from the Great Salt Lake which Sanders alleges infringes the '062 patent. Brine shrimp harvesting takes place during the winter months when brine shrimp eggs rise to the surface of the water and form slicks on the open lake. These slicks comprise eggs "entrained" at and just below the water surface, typically at depths from one-eighth to one–quarter inch. While the egg slicks originate out in the lake,

eventually the slicks drift to the shoreline. Prior harvesting methods typically involved manually raking of the brine shrimp eggs into bags from the shoreline. The '062 patent claims harvesting devices and methods for harvesting eggs in their natural state on the lake rather than by harvesting them from shore.

Sanders first publicly used the invention in October, 1986, and filed an original patent application on June 1, 1987 (the "parent application"). The parent application was abandoned and Sanders filed a continuation–in–part ("CIP") application on December 29, 1987. The CIP application modified the specification, altered the patent claims and added method claims. The CIP application matured into the '062 patent on June 13, 1989.

Sanders previously litigated alleged infringement of the '062 patent. In 1993, Sanders brought an action against Salt Lake Brine Shrimp, Inc., for patent infringement in this Judicial District before Judge Dee Benson. *Salt Lake Brine Shrimp, Inc. v. Sanders Brine Shrimp Co.*, No. 2:89-cv-812B (D. Utah 1993), *aff'd*, 1995 U.S. App. LEXIS 14255, 61 F.3d 918 (Table)(Fed.Cir.1995). In that case, on April 4, 1994, Judge Benson adopted a Report of the Special Master, in which the court found literal patent infringement as well as infringement under the doctrine of equivalents.[1]

### The Alleged Infringing Device & Method

The BAI device and method, which allegedly infringes the '062 patent, comprises a pontoon boat which supports a platform, an oil containment boom which encircles an egg slick, and a box–like working platform which is lowered into the water. BAI draws the boom tight, purposely causing the eggs to congeal and agglomerate under pressure to form a "cake" four to eight inches thick. BAI then submerges the box–like platform at least four inches below the water. BAI workers wade out to the front of the platform with rakes and shovels, break off chunks or "bergs" of the eggs from the cake, and manually pull the bergs closer to the working platform. The rear portion of this structure has three sides Portals for hoses used to pump the eggs into porous bags are set at the bottom of the rear vertical wall. These portals are positioned below the front leading edge of the working platform as the bottom surface of the platform descends from the front leading edge to the rear vertical wall of the structure. Workers allow water to mix with the bergs to create a thick, mud-like slurry which is manually pushed toward the back of the platform where it is then pumped into the porous bags. BAI uses slightly differing devices for the different harvest seasons. The more advanced devices which were employed between 1993 and 1996 are the subject of this lawsuit.[2]

### The Sanders Patent

The '62 patent claims a method and device for harvesting brine shrimp eggs. The method comprises the steps of positioning a concentrating funnel slightly below the layer of brine shrimp eggs at the surface level of a body of salt water, moving the concentrating funnel forward with respect to the eggs to collect a portion of the layer, and pumping the slurry mixture of eggs and salt water into a porous container which passes the salt water and retains the eggs. The device for implementing the method comprises a platform and attached channeling structure with a receiving end and a smaller, rearward feeding end. The channeling structure includes a height adjustment mechanism for selectively raising and lowering a forward leading edge of the channeling device to a depth of just below the egg layer. Portals located at the rearward feeding end of the channeling structure enable plumbing hardware to transport the eggs and salt water slurry into porous bags.

Claims 1–4, 8, 15–18 and 20 are the subject of this suit. Claims 1–4 are method claims, wherein claim 1 is an independent method claim, claim 2 is dependant on claim 1 and

---

1. See Section II.A., infra, for a discussion of this court's reasoning as to why the *Salt Lake Brine Shrimp* case is inapposite to the present case.

2. These devices are described in Exhibits 8,9,10 and 11, Appendix to Memorandum in Support of Bonneville Artemia's Motion for Summary Judgment or in the Alternative for Partial Summary Judgment (hereinafter "BAI's Appendix").

claims 3 and 4 are dependant on claim 2. Claim 8 is an independent device claim from which claim 15–18 are dependant. Claim 20 is an independent device claim. The focus of this case is on the three independent claims, i.e., claims 1, 8 and 20.

Claim I reads:

1. A method for harvesting brine shrimp eggs comprising the steps of:

locating a layer of buoyant brine shrimp eggs on a body of salt water; positioning a concentrating funnel having a flat leading edge and a lower trailing inlet port in the salt water with the flat leading edge slightly below the layer of brine shrimp eggs and surface level of the body of water; causing relative movement between the leading edge of the concentrating funnel and the eggs to collect a portion of the layer of eggs within the funnel and inlet port as a slurry mixture of salt water and eggs; pumping the slurry mixture to at least one porous receiving container which passes the salt water and retains the collected brine shrimp eggs.[3]

Claim 8 reads:

8. A device for gathering brine shrimp eggs from the surface of a body of water, comprising:

a platform having a forward section, a support surface, lateral edges and a rearward section;

flotation means coupled to the platform for maintaining sufficient buoyancy to keep the platform floating at the surface of the water;

channeling structure having a forward receiving end and rearward feeding end, said forward end including a base plate with a flat, leading edge adapted for positioning immediately below the shrimp eggs at the water surface, said channeling structure being coupled to the forward section of the platform and being adapted to receive water and entrained shrimp eggs at the channel receiving end and to channel the entrained eggs toward the feeding end,

height adjustment means coupled to the channel structure for providing adjustment of the height of the leading edge to a depth slightly below the surface of the water and entrained eggs to thereby collect the entrained eggs within the channel structure;

extraction means positioned at the feeding end and having an intake opening adapted to receive the entrained eggs and transport them to a storage location;

at least one porous contained capable of separating brine shrimp eggs from a slurry of eggs and salt water;

means for delivering the slurry' received at the extraction means to the porous container.[4]

Claim 20 reads:

20. A device for gathering brine shrimp eggs from the surface of a body of water, comprising:

---

3. Claims 2–4 read as follows:

2. A method for harvesting brine shrimp eggs an [sic] defined in claim 1, wherein the positioning step comprises placing a buoyant platform, having the funnel attached thereto, within the layer of eggs on the water surface and adjusting the attached concentrating funnel and inlet port to the defined position below the water level with the leading edge of the concentrating funnel in substantial parallel relationship with the surface level of the water.

3. A method for harvesting brine shrimp eggs as defined in claim 2, further comprising the step of pumping the slurry mixture to at least one porous container supported on the buoyant platform, wherein the salt water flows through the container, leaving collected eggs therein

4. A method for harvesting brine shrimp eggs as defined in claim 2, further comprising the step of extending diverging channeling structure forward of the concentrating funnel and within the layer of eggs to further gather and concentrate egg content within the salt water slurry feeding into the funnel.

4. Claims 15–18 read:

15. A device as defined in claim 8, wherein the height adjustment means provides selective leveling adjustment to position the flat leading edge to a depth of less than two inches below surface water, thereby minimizing the amount of water extracted with the shrimp eggs.

16. A device as defined in claim 8, wherein the height adjustment means provides selective leveling adjustment to position the flat leading edge to a depth of less than one half inch below surface water, thereby minimizing the amount of water extracted with the shrimp eggs.

17. A device as defined in claim 8, wherein the height adjustment means comprises a jack

channeling structure having a large, open, forward receiving end and a small rearward feeding end for collecting water and entrained brine shrimp eggs, said channeling structure being adapted to receive water and entrained shrimp eggs at the channel receiving end and to channel the entrained eggs toward the feeding end;

a flat leading edge attached at the forward receiving end and being adapted for use immediately below the surface of the water at a depth no greater than one inch to divide off suspended brine shrimp eggs at the surface of the water for delivery into the channeling structure;

means for positioning and maintaining the channeling structure approximately at the surface of the water, said leading edge being selectively positionable at a depth of less than one inch below the water surface;

extraction means coupled to the feeding end of the channeling structure for receiving the entrained eggs for transport to a storage location; and at least one porous container capable of separating brine shrimp eggs from a slurry of eggs and salt water;

means for delivering the slurry received at the extraction means to the porous container.

## STANDARD FOR SUMMARY JUDGMENT IN PATENT INFRINGEMENT CASES

The substance of BAI's motion for summary judgment or partial summary judg-

ment is that the patent is invalid either under the one–year bar of 35 U.S.C. § 102(b) or through inequitable conduct by Sanders before the Patent and Trademark Office ("PTO") during the prosecution of the patent. In its Reply Memorandum, BAI withdrew its summary judgment motion on the issue of inequitable conduct because Sanders had raised genuine issues of fact regarding its candor before the PTO. BAI also moves for summary judgment on the issue of infringement, arguing that its harvesting device does not infringe the '062 patent. Sanders submits a cross–motion for partial summary judgment arguing that its patent is valid and infringed by the BAI harvesting device.

█ Summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is as appropriate in a patent case as in any other. However, because infringement is itself a fact issue, the court approaches the infringement issue with care "proportioned to the likelihood of its being inappropriate." *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573, 225 U.S.P.Q. 236, 238 (Fed.Cir.1985). This court finds that the parties, having both moved for summary judgment, do not contest the structure of the accused device and therefore have removed any material fact issue which would preclude summary judgment.[5] *Id.* An infringement analysis involves two steps. First, the court must determine the meaning and scope of the patent claims asserted to be infringed. Second, the court compares the properly construed claims to the device accused of in-

having a height adjustable element, means for coupling the element to the leading edge, and a jack handle for selecting the desired height for the adjustable element.

18. A devise as defined in claim 8, wherein the extraction means comprises a pumping system having an intake end and output end, said intake end being coupled to the feeding end to receive the salt water and entrained eggs, the output end being positioned at the container for discharging the eggs therein.

5. Because the court is to approach the issue of infringement in a summary judgment motion with care, a word about the factual disputes in this case is warranted.

There is no factual dispute about the actual structure of the BAI device which allegedly infringes the '062 patent. The parties disagree as to the legal interpretation and physical operation of that device. For example, the parties dispute: (1) whether the slurry "falls" into the box–line structure of the BAI device, Memorandum in Support of BAI's Motion for Summary Judgment, p. 44; Memorandum in Opposition to BAI's Motion for Summary Judgment, p. 17; (2) whether the BAI working platform acts as a concentrating funnel, Memorandum in Support of BAI's Motion for Summary Judgment, p. 45, Memorandum in Opposition to BAI's Motion for Summary Judgment, p. 18; (3) whether the leading edge of the working platform is "flat," *i.e.*,

fringing. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd,* —— U.S. ——, 116 S.Ct.` 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996).

### ANALYSIS

Defendant contends that the Sanders patent is invalid under the one year statutory bar because new matter which does not relate back to the original patent was included in the CIP application. Defendant also maintains that Sanders claims properly interpreted have not been infringed. These contentions will be discussed in that order. Because interpretation of a sub–element [6] of the "channeling structure" and the two inch depth limitation has bearing on the "relation back" analysis in section I.B. 1, infra, the court's interpretation of these elements is included in that section of the opinion. All remaining claim interpretation occurs in section II.A, infra.

## I. VALIDITY OF THE SANDERS PATENT

### A. In General

 Patents, when issued, are cloaked with a statutory presumption of validity. 35

horizontal or tilted with respect to the surface of the water (BAI argues it is tilted, and Sanders argues that it is tilted because BAI cranked the boom too tight and broke it, and simply haven't fixed it. Nevertheless, Sanders argues, it was still designed to be flat, or horizontal to the surface of the water.), Memorandum in Support of BAI's Motion for Summary Judgment, p. 45–46; Memorandum in Opposition to BAI's Motion for Summary Judgment, p 18; (4) whether one can "constantly" adjust the BAI device; Memorandum in Support of BAI's Motion for Summary Judgment, p. 46–47; Memorandum in Opposition to BAI's Motion for Summary Judgment, p. 19–20;(5) whether the BAI pumps lose their prime if lowered one inch or less below the water surface; Memorandum in Support of BAI's Motion for Summary Judgment, p. 47; Memorandum in Opposition to BAI's Motion for Summary Judgment, p 20; and (6) the effect of the 10″ hinged flap attached to the working platform, Memorandum in Support of BAI's Motion for Summary Judgment, p. 47–48, Memorandum in Opposition to BAI's Motion for Summary Judgment, p. 20–21.

The structure of the BAI device in an infringement analysis is uncontested. In light of the court's interpretation of the claims, without reference to the accused device, *SRI International v. Matsushita Electric Corporation of America*, 775 .

U.S.C. § 282.[7] Persons seeking to invalidate a patent must satisfy the burden of proving prior public use with evidence that is clear and convincing. *Buildex Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463, 7 U.S.P.Q.2d 1325, 1326–27 (Fed.Cir.1988) This burden also applies to anyone seeking summary judgment. *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1022, 226 U.S.P.Q. 881, 884 (Fed.Cir.1985).

### B. The one–year bar under 35 U.S.C. § 102(b)

### 1. The Doctrine of Relation Back

Continuation–in–Part applications allow an applicant to avoid filing a new patent by filing a subsequent application which repeats a substantial portion or all of the parent application, but also introduces new material, which is supported by and inherent in the parent application. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1436–37, 221 U.S.P.Q. 97, 105 (Fed.Cir.1984) 35 U.S.C. § 120 permits a CIP application to "relate back" to the filing date of the parent application if the parent discloses the invention

F.2d 1107, 1118, 227 U.S.P.Q. 577, 583 (Fed.Cir. 1985), the contested factual disputes do not constitute disputes of material facts and hence do not preclude the determination of infringement under summary judgment Therefore, ruling on summary judgment motions based on a patent claim interpretation and literal infringement is appropriate in this case.

6. In this opinion, a "sub–element" refers to specific structures which combine to make an element of the claim. For example, an element of claim 8 is the "channeling structure." Sub–elements of the channeling structure include the forward receiving end, rearward feeding end, the base plate, etc, because these sub–elements, when combined, comprise the channeling structure.

7. § 282 Presumption of validity; defenses

A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims, dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity. 35 U.S.C. § 282 (1997).

claimed in the CIP in full. clear, concise and exact terms sufficient to enable one skilled in the art to make and use the same. under 35 U.S.C. § 112, first paragraph, which provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in *such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same,* and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112, first paragraph (1984) (emphasis added)

In this case, Sanders abandoned its parent application and filed a CIP application on December 29, 1987. BAI asserts that the '062 patent is unenforceable because the patent is invalid under 35 U.S.C. § 102(b). Section 102(b) bars entitlement to a patent if the "invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...." 35 U.S.C. § 102(b) (1984).[8] Sanders' first publicly used his harvesting device in October, 1986. To avoid a statutory bar under § 102(b), any new matter in the CIP application, which was filed on December 29, 1987, must "relate back" under 35 U.S.C. § 120 [9] to the June 1, 1987 filing date of the parent application.[10] Any new matter in the CIP that does not relate back to the parent application will be afforded the later filing date of December 29, 1987, with the consequence of being statutorily barred

under § 102(b) because of prior use of the invention in October, 1986.

For Sanders to be entitled to claim the benefit of the filing date of the parent application, June 1, 1987, its parent application must disclose the CIP invention in the manner required by 35 U.S.C. § 112, first paragraph. *In re Berkman,* 642 F.2d 427, 430, 209 U.S.P.Q. 45, 47 (C.C.P.A.1981). The test requires that the parent application "convey with reasonable clarity to those skilled in the art, as of the filing date [of the original application], he or she was in possession of ... whatever is now claimed" in the patent. *Vas–Cath, Inc. v. Mahurkar,* 935 F.2d 1555, 1560, 19 U.S.P.Q.2d 1111, 1117 (Fed.Cir.1991). The invention claimed in the CIP application does not have to be described *in ipsis verbis* in the parent application to satisfy § 112. *Wagoner v. Barger,* 59 C.C.P.A. 1213, 463 F.2d 1377, 1380, 175 U.S.P.Q. 85, 86 (1972). Whether the parent specification comes close enough to comply with the description requirement of § 112 must be determined on a case–by–case basis, and whether the written description requirement has been met is a question of fact. *Ralston Purina Co. v. Far–Mar–Co., Inc.,* 772 F.2d 1570, 1575, 227 U.S.P.Q. 177, 179 (Fed.Cir.1985).

Because a CIP application adds new matter, such an application may generate two filing dates applicable to different parts of the same patent. *Litton Systems,* 728 F.2d at 1438, 221 U.S.P.Q. at 106. Any claims with new matter not inherent or finding support in the parent application are not

8. § 102 Conditions for patentability, novelty and loss of right to patent
 A person shall be entitled to a patent unless—
 (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or
 35 U.S.C. § 102(b) (1984).

9. § 120 Benefit of earlier filing date in the United States
 An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States, or as provided by section 363 of this title, which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.
 35 U.S.C. § 120 (1997).

10. BAI withdrew its inequitable conduct argument for patent invalidity because it conceded that Sanders raised a material factual dispute which would preclude summary judgment.

entitled to the benefit of the parent application filing date. *Id.* New matter is defined as matter involving a departure from or in addition to the original disclosure. 37 C.F.R. § 1.118.[11] Defendant Bonneville Artemia, as the challenger of the validity of the patent based on inadequate disclosure in the parent application for the claims in the CIP application, bears the same burden of persuasion as does any other patent challenger. *Ralston Purina,* 772 F.2d at 1573, 227 U.S.P.Q. at 178.

## 2. Applicability of the Doctrine of Relation Back to claims in the Sanders Patent

■ Defendant urges that numerous significant changes in the CIP constitute "new matter."

### a—"Skimming" Device

Defendant argues that the language in the parent application referring to "skimming" devices was altered to include any "funnel" capable of receiving a slurry of eggs and water in a controlled manner. In a "red-line" version of the CIP application, which highlights matter which was added and strikes-out matter removed from the parent application, it is apparent that numerous references to "skimming device," "skimmer." or "skimming" were changed to "channeling structure," [12] "extracting device," [13] "funnel." or "funneling device" [14] and "concentrating device" or "concentrating means." [15] However-

er, not every reference to "skimming device" was removed. In the detailed description of the invention, column 5, line 6–7 of the '062 patent, "skimming device" is labeled as a "primary feature" of the system.

The court finds that none of the numerous variations describing the structure generally known as the skimming device is "new matter." The alterations in the CIP only describe the different operations and features of the "skimming device" A drawing of the structure, included as figure 2 in the '062 patent, was disclosed in the parent application. The court finds that the additional clarification language in the CIP application which further describes the capabilities of this disclosed structure is not "new matter" which fails to relate back to the parent application filing date of June 1, 1987. *See, Kennecott Corp. v. Kyocera Int'l, Inc.,* 835 F.2d 1419, 1422, 5 U.S.P.Q.2d 1194, 1197 (Fed.Cir. 1987), *cert. denied,* 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 198 (1988) ("[T]he earlier and later applications need not use identical words. if the earlier application shows the subject matter that is claimed in the later application, with adequate description as to how to obtain it."), *Vas–Cath Inc.,* 935 F.2d at 1565, 19 U.S.P.Q.2d at 1111 (drawings alone may provide sufficient "written description" of an invention as required by § 112).

### b—Channeling Structure

Defendant also asserts that the "wedge–shaped" channeling structure disclosed in the parent application was broadened in the CIP

---

11. § 1.118 Amendment of disclosure.

(a) No amendment shall introduce new matter into the disclosure of an application after the *filing* date of the application (§ 1.53(b)) All amendments to the specification, including the claims, and the drawings filed after the filing date of the application must conform to at least one of them as it was at the time of the filing of the application Matter not found in either, involving a departure from or an addition to the original disclosure, cannot be added to the application after its filing date even though supported by an oath or declaration in accordance with § 1.63 or § 167 filed after the filing date of the application

(b) If it is determined that an amendment filed after the filing date of the application introduces new matter, claims containing new matter will be rejected and deletion of the new matter in the specification and drawings will be required even

if the amendment is accompanied by an oath or declaration in accordance with § 1.63 or § 1.67. 37 C.F.R. § 1.118(1997).

12. Page 4, line 2; page 15, lines 24–25; page 18, line 11 of the "red–line" CIP application, included as Ex. 6 in Defendant's Memorandum in Support of BAI's Motion for Summary Judgment or in the Alternative for Partial Summary Judgment (hereinafter, "red–line").

13. Page 4, line 12; page 10, line 25; page 11, line 20 ("red–line").

14. Page 9, lines 10, 16, 18–19 and 21; page 10, lines 5, 16, 22 and 25; page 11, lines 3, 7 and 9; page 12, lines 3–4, 6, 18 and 28; page 13, lines 6–7 ("red–line").

15. Page 6, lines 13–14 and 15; page 7, line 15; page 9, lines 6 and 8 ("red–line").

**902**

application to only claim a "channeling structure."[16] A non wedge–shaped channeling structure could ostensibly include parallel wings, round booms and elliptically shaped devices. The confusion about the wedge–shaped channeling structure arises because Sanders applies the term "channeling structure" to two elements of the device in the parent application, only one of which appears to require a wedge–shape.

The parent application describes a wedge–shaped channeling structure as feature 12 of figure 1.[17] Feature 12 discloses diverging wings used to gather or concentrate the naturally occurring eggs to the skimmer. The drawings submitted with the parent application disclose these wings in a wedge–shape, diverging from the receiving edge of the skimming device. However, another channeling structure is also disclosed. The funnel cavity bounded by a flat, leading edge and side wall structure, designated as feature 43, is also described as a "channeling structure." This second channel structure in the parent application includes a receiving end and or opening at the front of the skimmer and a rearward end, feature 44, at the rear of the skimmer for collecting water and entrained eggs.[18]

It appears to the court that the original claim 8 claimed the diverging wings or "wedge–shaped" channeling structure on page 7, lines 14–24 ("red–line"). Claim 8 was amended in the CIP to claim the second channeling structure, found on page 9, lines 8–24 ("red–line").[19] Thus it became necessary to remove the "wedge–shaped" language because the second channeling structure is not necessarily wedge–shaped. Because the second channel structure is disclosed in the parent application through descriptive language and several drawings, the court finds sufficient support in the original application for the CIP channel structure in claim 8.

*c—Skimming at Depths Below Two Inches*

Defendant also argues that the parent application only discloses and claims skimming brine shrimp eggs from the surface of the water at a depth no greater than two inches.[20] The original claim 1 limited skimming to a depth of "less than two inches below the surface of the water. . . ." Page 18, lines 12 and 13 ("red–line") The original claim 10, and the CIP claim 20, limit positioning the skimming device to "immediately below the surface of the water at a depth no greater than one inch. . . ." Page 21, lines 11 and 12 ("red–line") Following the CIP amendments, claim 1 of the '062 patent positions the flat leading edge "slightly below the layer of brine shrimp eggs and surface level of the body of water; . . . ." Page 16, lines 9–10 ("red–line"). The CIP claim 8 replaced the parent claim 1 and removed the 2 inch depth restriction to read "height adjustment means coupled to the channel structure for providing adjustment of the height of the leading edge to a depth slightly below the surface of the water and entrained eggs. . . ." Page 18, lines 11–14 ("red–line"); Col. 11, lines 20–25, '062 patent. The CIP claim 15 is dependant on claim 8 and contains the 2–inch depth limitation: "A device as defined in claim 8, wherein the height adjustment means provides selective leveling adjustment to position the flat leading edge to a depth of less than two inches below the surface water, thereby minimizing the amount of water extracted with the shrimp eggs." Col. 12, lines 7–11, '062 patent. Therefore, defendant argues that there is no support in the parent for claiming in the CIP application skimming or extracting brine shrimp eggs deeper than two inches.

Defendant also asserts that the parent application articulates principles that embody the invention, "These principles include the fact that skimming of brine shrimp eggs must be accomplished at a depth of less than

16. Page 17, line 26; page 3, lines 21–22 ("red–line").

17. Page 6, line 12; page 7, line 14; page 8, line 8 ("red–line").

18. Page 9, lines 8–14 ("red–line").

19. CIP claim 19, which is dependent on claim 8, adds the "wedge–shaped" channel structure as being included as part of the claim 8 channel structure.

20. Page 11, lines 19–21; p. 13, lines 6–8; p. 18, lines 11–14 of the "red–line" CIP application.

two inches, and preferably at a range of one quarter to one inch in depth. Furthermore, this depth must be adjustable to enable an operator to immediately vary its position as egg layered depth changes across the water surface." Page 11, lines 19–23 ("red–line") Defendant argues that when a later CIP application is inconsistent from the principles of the prior application, it cannot be contended that the second application is inherent in or "supported by" the first. *Stearn v. Superior Distributing Co.,* 674 F.2d 539, 547, 215 U.S.P.Q. 1089, 1095 (6th Cir.1982) (When something is claimed specifically, the applicant cannot amend an application by a CIP or otherwise to claim attributes that are inconsistent with those stressed in the parent.).

Sanders argues that adequate support in the parent application for extracting brine shrimp eggs from a depth of greater than two inches exists. The parent specification includes the following language:

The present invention relates to a device and method for harvesting or collecting brine shrimp eggs from a water body. Page 1, lines 6–7 ("red-line").

Figure 3 discloses an alternate embodiment and structure for positioning and maintaining the channel structure at the appropriate water surface level.... A more specific height adjustment mechanism 16 is needed to selectively position the skimmer and skimmer lip 45 at the desired depth below the water surface. This position is changing and requires adjustment because of variable depths of floating eggs at the water surface.... It is critical, therefore, that the skimmer includes structure which enables its selective adjustment to a variable depth which is determined by an operator or other sensing means. Page 10, lines 11–13, 15–18 and 22–24 ("red–line").

Accordingly, this final adjustment mechanism operates with respect to the skimmer support housing and enables the operator to adjust the skimmer lip 45 precisely to the water depth which maximizes the harvest operations. Page 11, lines 11–13 ("red–line").

 Sanders argues that the "principles" quoted by BAI are only recognition of the most likely or typical circumstances that brine shrimp eggs are naturally found, and that other language in the specification quoted above provides support for egg extraction at depths lower than 2 inches. The proper test is whether the written description and drawings in the initial disclosure conveyed to an artisan that the inventor had possession at the time of the earlier disclosure of all of the later–claimed subject matter and that "the scope of enablement provided to that artisan by the prior application was reasonably commensurate with the full scope of protection sought by the later claim." *United States Steel Corp. v. Phillips Petroleum Co.,* 865 F.2d 1247, 1250, 9 U.S.P.Q.2d 1461, 1464 (Fed.Cir.1989). Bruce Sanders, the inventor, testified that brine shrimp eggs can naturally accumulate to depths of between a thirty-second of an inch to six inches thick. Deposition of Bruce Sanders at 66–67, 80–81. Therefore, Sanders argues that the original application would convey to a person of ordinary skill in the art, who knows that eggs can accumulate at depths up to six inches, that the invention covers lowering the leading edge of the invention to depths greater than six inches. This court disagrees.

 The determination of whether claim 8 is invalid under the § 102(b) one–year bar hinges on the court's interpretation of the depth requirement of that claim, *i.e,* whether there is no depth limitation or whether a two inch or less depth requirement should be read into the claims from the "principles" found in the specification. This court interprets claim 8, as a matter of law, to include the limitation found in the specification that the depth of the leading edge must be two inches or less below the water surface.

 Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims. *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571, 7 U.S.P.Q.2d 1057, 1064–65 (Fed.Cir.1988) (no evidence in the specification to indicate that limitations concerning semiconductor RAMs and $log_2 n$ address lines should be read into

the claims). The claims must be read in light of the specification, of which they are a part. *Markman*, 52 F.3d at 979, 34 U.S.P.Q.2d at 1329. The specification contains a written description of the invention, and may act as a dictionary which explains the invention and may define terms used in the claims. *Id.* Recourse must be had to the specification to determine how far the means there disclosed correspond with those made by the defendant. *Autogiro Company of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 398, 155 U.S.P.Q. 697, 703 (1967). "Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 6 U.S.P.Q.2d 1601, 1605 (Fed.Cir.1988) (emphasis in original).

The height adjustment requirement of claim 8 is a "means plus function" element: "height adjustment means ... for providing adjustment of the height of the leading edge to a depth slightly below the surface of the water and entrained eggs...." 35 U.S.C. § 112, sixth paragraph, provides that the specifications define such a means plus function element:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and *such claim shall be* *construed to cover the corresponding* *structure, material, or acts described in* *the specification and equivalents thereof* 35 U.S.C. § 112, sixth paragraph (1984) (emphasis added). Therefore, to ascertain the scope of the height adjustment means, § 112 directs the court to consider the structural and acts described in the specification.

■■■■■ With these principles in mind, this court notes that the 2–inch depth disclosure in the specification in this case is not found in an example or possible embodiment of the invention. The specification declares the 2–inch depth requirement as a "fact" and one of the two fundamental principles of the invention. With such a definitive statement of the depth requirement of Sanders' invention, this court is unpersuaded that the language cited by Sanders, which generally states that the channel structure must be positioned at an appropriate depth, is broad enough to support depths beyond the 2–inch boundary Therefore, in claim 8, the depth of the height adjustment element which provides positioning the leading edge "to a depth slightly below the surface of the water and entrained eggs" is defined by the specification as a depth of two inches or less below the water surface.[21] The court finds that the language cited by Sanders from the specifications refers to "appropriate depths," or "variable depths" which are within the 2–inch or less boundary disclosed in the specification.[22]

---

21. Claim 15 is dependant on claim 8 and adds the 2–inch limitation. The court is aware of the doctrine of claim differentiation that it is improper for courts to read into an independent claim a limitation explicitly set forth in another claim. *Environmental Designs, Ltd. v. Union Oil Co. of Calif.*, 713 F.2d 693, 699, 218 U.S.P.Q. 865, 871 (Fed.Cir.1983). However, this limitation of necessity applies only to the limitations which are not already in the independent claim. The court cannot "read" a limitation into a claim if the limitation is already present. Furthermore, the doctrine of claim differentiation should not be applied to read out a limitation from an independent claim solely because the limitation is present in a dependent claim. *See, Slater Electric, Inc. v. Thyssen–Bornemisza Inc.*, 650 F.Supp. 444, 464, 1 U.S.P.Q.2d 2009, 2023 (S.D.N.Y. 1986); *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1024, 1028, 4 U.S.P.Q.2d 1283, 1292 (Fed.Cir.1987) ("[T]he doctrine of claim differentiation does not allow unrestrained expansion of claims beyond the description of the invention on the specification.... Whether or not claims differ from each other, one can not interpret a claim to be broader than what is contained in the specification and claims as filed.").

In *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 229 U.S.P.Q. 805 (Fed.Cir.1986) the district court read into independent claim 3 a limitation which the court recognized rendered dependent claim 4 redundant. The Federal Circuit affirmed, stating that the district court's view of the interpretation of the claim was more reasonable than the appellant's interpretation. Accordingly, this court reads a 2–inch or less depth limitation into claim 8, although it renders claim 15 redundant.

22. While Sanders argues that the principles cited above only disclose a typical depth, the language reveals that the best mode or typical depth is from one fourth to one inch: "preferably at a range of one fourth to one inch in depth." Page 11, lines 19–23 ("red–line"). Therefore, one

 court also finds that the "positioning ... slightly below the layer of brine shrimp eggs and surface level of the body of water" element of method claim 1 is also limited to a 2–inch or less depth. Claim 1 contains no "means plus function" elements, however, the court must interpret the "positioning" step of the method in light of the specification, which acts as a dictionary to explain and define terms used. *Markman*, 52 F.3d at 979, 34 U.S.P.Q.2d at 1329–30. In *Markman*, the Federal Circuit, affirmed by the Supreme Court, interpreted the disputed word "inventory" in a patent claim to refer to articles of clothing, not cash or inventory receipts as argued by Markman. The specification and prosecution history confirmed this interpretation because they only used the term "inventory" in reference to articles of clothing. *Markman*, 52 F.3d at 982, 34 U.S.P.Q.2d at 1331–32. The claims must conform to the specification. 37 C.F.R. § 1.75(d).[23] Furthermore, the court should not interpret a claim to be broader than what is contained in the specification and claims as filed. *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1024, 4 U.S.P.Q.2d 1283, 1288 (Fed.Cir.1987). This court interprets the word "positioning," in conformity with the principles of the specification, to have a limitation on the depth of the positioning to two inches or less below the water surface.

The parent application discloses the two inch depth limitation. Accordingly, the parent application disclosure supports the claims in the CIP application which are interpreted as being subject to the same limitation.

Based upon the foregoing discussion and interpretation of new matter within the CIP application, changes made therein all relate back to the parent application and none of the '062 patent claims are invalid under the § 102(b) one–year bar.

## II. PATENT INFRINGEMENT LITERALLY AND UNDER THE DOCTRINE OF EQUIVALENTS.

### A. CLAIM INTERPRETATION

 Construction of patent claims, which define the scope of a patentee's rights, is a matter of law exclusively for the court. *Markman*, ⸺ U.S. at ⸺, 116 S.Ct. at 1387, 38 U.S.P.Q.2d at 1462. Several elements of claims 1 and 8 have already been discussed and interpreted above. The "position" element of the method of claim 1 and its dependents is limited to a positioning at a depth of 2 inches or less below the water surface The "height adjustment means" in claim 8 and its dependents is limited to means which may adjust the channeling structure of claim 8 at a depth of 2 inches or less below the surface of the water. The "channeling structure" element of claim 8 is not limited to a "wedge-shaped" channeling structure.

BAI argues that Sanders is taking claim interpretation positions in this case that are contrary to positions taken in the *Salt Lake Brine Shrimp, Inc.*, litigation.[24] Therefore, BAI asserts that prior positions in other litigation should be viewed by this court as admissions. This court disagrees.

 BAI is blending file wrapper (prosecution history) estoppel with judicial estoppel. The doctrine of file wrapper estoppel precludes a patent owner in an infringement suit from obtaining a construction of a claim which would in effect resurrect subject matter surrendered during the prosecution of the patent. 5 Donald S. Chisum, *Patents*, § 18.05[1] (1997).

 The Tenth Circuit and the Federal Circuit allow a file wrapper estoppel to arise from arguments made to the Patent Office during patent prosecution. *Swift Agricultural Chemicals Corp. v. Farmland Industries, Inc.*, 499 F.Supp. 1295, 1304, 210

---

fourth to one inch in depth is the typical depth, and a depth of two inches defines the outer limits of the invention.

**23.** 37 C.F.R. § 1.75(d)(1) provides:

The claim or claims must conform to the invention as set forth in the remainder of the

specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description. 37 C.F.R. § 1.75(d)(1) (1997).

**24.** See text at pages 895–896, *supra*.

U.S.P.Q. 137, 145 (D.Kan.1980), *aff'd*, 674 F.2d 1351, 213 U.S.P.Q. 930 (10th Cir.1982) *Jonsson v. Stanley Works*, 903 F.2d 812, 818, 14 U.S.P.Q.2d 1863, 1868 (Fed.Cir.1990). However, arguments made in the course of litigation are *not* part of the file wrapper or prosecution history of the patent.

The issue in this case is judicial estoppel. Judicial estoppel bars a party from adopting inconsistent positions in the same or related litigation. *United States v. 49.01 Acres of Land, More or Less*, 802 F.2d 387, 390 (10th Cir.1986). The Tenth Circuit has rejected this doctrine because public policy can be vindicated in cases of false statements in pleadings more practicably and fairly than through suppression of truth in the future. *Id.* Even if this circuit had not rejected judicial estoppel, it noted that most courts that have adopted judicial estoppel to bar a party from presenting an inconsistent assertion in subsequent litigation only if that party succeeded in the earlier litigation. *Id.* Furthermore, judicial estoppel normally applies only to statements of fact, not legal conclusions. *Smith v. Midland Brake, Inc.*, 911 F.Supp. 1351, 1360 (D.Kan.1995).

█ It is well established that claim interpretation is a matter of law. Accordingly, this court rejects BAI's contention regarding alleged admissions by Sanders through its claim interpretation arguments to the court in the *Salt Lake Brine Shrimp* litigation. This court will not consider inconsistent arguments made by Sanders in other litigation as admissions.

## I. *Claim 8*

Several elements of claim 8 are explicitly or implicitly admitted by BAI to be part of its device: the "platform having a forward section," "flotation means" "extraction means," "at least one porous container," "means for delivering the slurry received," and "forward receiving end and rearward feeding end." The relevant elements in this case as to which dispute in interpretation exists are the "channeling structure" and "height adjustment means."

The interpretation of several sub-elements of the channeling structure are in dispute: (1) the forward end of the channeling structure including a base plate with a flat, leading edge; (2) the leading edge being adapted for positioning immediately below the shrimp eggs at the water surface; and (3) the channeling structure being adapted to channel the entrained eggs toward the feeding end.

*Sub-element 1. A base plate with a flat, leading edge at forward end of the channeling structure*

█ BAI argues that a "flat" leading edge must be horizontal, *i.e*, parallel to the water surface.[25] This court rejects this asserted limitation, and interprets a "flat" surface to mean "relatively smooth or even." Merriam Webster's Collegiate Dictionary, (Tenth Edition), 1993, at 443 BAI's interpretation, coming from an extrinsic source (the dictionary) cannot be used for the purpose of varying or contradicting the terms of the claims *Markman*, 52 F.3d at 980–81, 34 U.S.P.Q.2d at 1330. Interpreting flat to mean a relatively smooth or even surface, as opposed to requiring the surface to be horizontal, finds more support in the specification. The flat, leading edge, feature 45 of figure 2, discloses a relatively smooth or even

---

25. BAI cites the Random House Unabridged Dictionary, defining "flat" as "horizontally level." Furthermore, BAI relies heavily on a position taken by Sanders in the *Salt Lake Brine Shrimp* litigation which appears to support their definition of flat. However, claim interpretation is a matter of law, and since judicial estoppel is not followed in the Tenth Circuit, this court declines to force Sanders to adhere to this definition See, section IIA of this opinion.

Furthermore, even if this court were to adopt interpretations of the word "flat" made by this District Court and the Federal Circuit, the Federal Circuit did not limit its definition of flat to requiring the leading edge to be horizontal: "the

term 'flat leading edge' as used in the patent claims and the specification requires only a flat top surface of the leading edge of the skimming device." *Salt Lake Brine Shrimp*, Finally, the specific language cited by BAI which requires the "flat" leading edge to be horizontal to the water surface is in reference to support for the definition of "flat" in *claims 2 and 5*, which require that the leading edge be placed "in substantial parallel relationship with the surface level of the water." *Id.* Therefore, the judicial conclusions in the *Salt Lake Brine Shrimp* litigation would support Sanders' definition of "flat" in this litigation to only require a flat top surface of the leading edge of the skimming device.

surface. "The flat receiving edge 45 is attached a[sic] the forward receiving end of the funnel and is adapted for positioning and use immediately below the surface of the water and the entrained eggs which are to be withdrawn." Col. 6, lines 29–31 ('062 patent). The disclosure emphasizes the importance of skimming the entrained eggs and an appropriate amount of water to create the slurry mixture. The flat, or relatively smooth or even leading edge serves this purpose. Therefore, this court interprets "flat" to only require a relatively smooth or even leading edge which enables the harvesting device to skim or extract brine shrimp eggs from the surface of the water.

Furthermore, BAI's working platform was designed to be horizontal, but is slightly slanted because it was bent during operation and remains unfixed. This court doubts whether a device which would infringe as designed could escape infringement based upon its damaged condition.

*Sub–element 2. The leading edge of the channeling structure being adapted for positioning immediately below the shrimp eggs at the water surface*

■ BAI argues that this "positioning" element of claim 8 requires *constant and immediate adjustment* of the channeling structure, which its device cannot accomplish because it is heavy, bulky and difficult to adjust. This "constant adjustment" argument also applies to the "height adjustment means" element of claim 8. The specification provides:

> Accordingly, the positioning step involves constant adjustment of the leading edge of the funnel to ensure its location just below the egg level. This is accomplished by using a height adjustment device to selectively move the funnel up or down. depending upon the change in layer thickness.

Col. 3, lines 62–67 ('062 patent).

> ... [The funnel structure's] depth must be adjustable to enable an operator to imme-

diately vary its position as egg layered depth changes across the water surface....

Col. 7, lines 47–49 ('062 patent). This court disagrees that a constant and immediate adjustment limitation be read into claim 8.[26]

First, in claim 8, neither the height adjustment element nor the "positioning" sub element of the channeling structure require "constant" or "immediate" adjustability. Claim 8 only requires the leading edge to be adapted for positioning immediately below the shrimp eggs and the height adjustment means are coupled to the channel structure for providing adjustment of the height. Second, the specification does not define the scope of patent protection. The examples and discussion of constantly and immediately positioning the leading edge of the skimmer are examples of embodiments of the invention found in the specification, not fundamental principles to the invention, and therefore will not be read into the claims. *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 699, 218 U.S.P.Q. 865, 871 (Fed.Cir. 1983). This court declines to read a constant or immediate adjustability limitation from the specification into claim 8.

*Sub–element 3. Channeling structure being adapted to channel the entrained eggs toward the feeding end.*

■ BAI argues that its working platform does not "channel" the egg slurry to the hose portals, it merely "contains" the slurry. Using an extrinsic definition from the Random House Unabridged Dictionary, BAI asserts that "channel" means to "direct toward or into some particular course," which implies an "automated fashion" By employing manual labor to move the slurry through the working platform, BAI contends that its device does not "channel" the slurry in a one–

---

**26.** From oral argument, it is plain to the court that BAI's height adjustment mechanism sometimes gets "stuck" because the working platform is broken and has not been fixed. Working as designed, the working platform would be adjustable through turning the height adjustment wheel. The court is unpersuaded that the oper-ating characteristics of a broken BAI device would transform it from an infringing harvesting device to a non infringing device. "Imperfect practice of an invention does not avoid infringement." *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20, 223 U.S.P.Q. 591, 597 (Fed.Cir.1984).

step procedure like Sanders' device, which does not require manual labor.

Claim 8 only requires the channeling structure to "receive water and entrained shrimp eggs at the channel receiving end and to channel the entrained eggs toward the feeding end." Col. 11, lines 17–20 ('062 patent). BAI argues for limitations from the specification to be read inappropriately into the claims where the specification is providing enabling description of possible embodiments of the invention. The specification also supports a passive channeling effect of the structure. The figures in the specification disclose the channel structure without any reference to automation or a one–step procedure. The water and entrained eggs are collected at the leading edge of the channeling structure where they fall or move into the funnel cavity. They are then drawn into the rearward feeding end where the suction holes are located. Col. 6, lines 35–39 ('062 patent). "Means are provided for maintaining the channeling structure approximately at the surface of the water ... to direct brine shrimp eggs toward the narrow feeding end of the channel." Col. 2, lines 57–61 ('062 patent). The "channeling" effect is derived from the channeling structure's bottom surface, three side walls and the relative movement of the entrained eggs with respect to the channeling structure. The court declines to impose any requirement of an ambiguous one–step procedure or automated channeling structure to claim 8's channeling structure BAI argues an interpretation of a channeling structure which requires the structure to 1) receive water and eggs in a controlled manner, Col. 3. lines 38–40 ('062 patent); 2) allow the slurry to fall by gravitation into an inlet port, Col. 4, lines 8–9 ('062 patent); and 3) act as a concentrating funnel. Col. 5, line 13; col. 3, lines 34–35 ('062 patent). This court

disagrees that these limitations be imposed on claim 8.

■ BAI argues that its working platform cannot receive a slurry mixture in a controlled manner and that a slurry cannot fall by gravitation to the inlet port because it has a "virtually flat bottom" and hose ports which are only ½ inch lower than the front of the working platform. Col. 3, lines 38–40; Col. 4, lines 8–9 ('062 patent).—Claim 8 imposes no such limitations. Preferred embodiments appearing in a specification will not be read into the claims when the claim language is broader than the specification. *Electro Medical Systems v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054, 32 U.S.P.Q.2d 1017, 1021 (Fed.Cir.1994) While the claims are interpreted in light of the specification, not everything expressed in the specification must be read into all the claims. *SRI International v. Matsushita Electric Corporation of America*, 775 F.2d 1107, 1121, 227 U.S.P.Q. 577, 585 (Fed.Cir.1985) This court declines to read language such as "controlled manner" and slurry "falling by gravity" in the specification as limitations on the claims.[27]

Claim 8 does not require the channeling structure to act as a concentrating funnel. The specification states that a funnel may be "anything that is capable of receiving a slurry mixture of salt water and eggs in a controlled manner." Col. 3, lines 37–40 ('062 patent). Claim 8 does not mention a concentrating funnel, therefore, no "concentrating" limitation will be read into claim 8's channeling structure. Even if the court interpreted the channeling structure and concentrating funnel as essentially the same structure, however. claim 8's language, "being adapted to receive water and entrained eggs ... and to channel the entrained eggs toward the feeding end," would not be limited by the specification to a device that concentrates the slurry.

27. Furthermore, these arguments appear to be disputes about the degree of control or ability of the slurry to fall by gravitation to the inlet ports. BAI's working platform is not flat, its hose ports are 1/2 inch lower than the front of the working platform. There is a descending slope from the front of the working platform to the inlet ports. Therefore, BAI argues that it is "virtually flat." In viewing the BAI devices contained in tabs 8, 9 and 10 of BAI's Appendix, it appears to the court that the hose ports are not *located* 1/2 inch below the front surface of the platform, but that the very top of the opening of each hose port is 1/2 below the platform surface. The descending surface appears more dramatic than BAI has represented and is obviously not flat. In any event, the court finds the shape of the BAI's working platform is "adapted to channel the entrained eggs toward the feeding end," as claimed in claim 8.

### 2. *Claim 20*

Claim 20 explicitly limits the skimming of the channeling structure to a depth of one inch or less. This claim describes the skimmer itself independent of any boat or platform to which it may be attached BAI argues that its device does not embody the first three elements of claim 20: 1) the channeling structure having a large, open, forward receiving end and a smaller rearward feeding end for collecting water and entrained brine shrimp eggs; 2) a flat leading edge attached at the forward receiving end and being adapted for use immediately below the surface of the water at a depth no greater than one inch to divide off suspended brine shrimp eggs at the surface of the water; and 3) means for positioning and maintaining the channel structure approximately at the surface of the water.

#### *The channeling structure*

■ The channeling structure in Claim 20 is interpreted similarly to the channeling structure discussed above in claim 8. However, the channeling structure in claim 20 requires the forward feeding end to be "open" and "larger" than the "smaller" rearward feeding end.

#### *The flat leading edge*

■ As interpreted above, the flat leading edge of claim 20 does not require it to be horizontal with the water. The flat leading edge can be a relatively smooth or even leading edge. The positioning depth of the leading edge is clearly limited to one inch or less below the water surface. BAI argues that this flat leading edge of claim 20 must have a "functional" limitation from the specification that it be able to "skim" a layer of eggs from the rest of the salt water body, so that a slurry mixture is collected. Cols. 3, 6 and 9 ('062 patent). This court declines to read such a limitation into claim 20.

#### *Means for positioning and maintaining the channel structure approximately at the surface of the water, said leading edge being selectively positionable at a depth of less than one inch below the water surface*

■ BAI argues that the means for positioning the channel structure must be limited to those which can constantly and selectively be adjusted up and down While the claims are interpreted in light of the specification, not everything expressed in the specification must be read into all the claims. *SRI International,* 775 F.2d at 1121, 227 U.S.P.Q. at 585. This court declines to import the "constant" adjustment requirement. Claim 20 clearly requires the leading edge to be "selectively positionable" within the depth range of one inch or less.

### 3. *Claim 1*

The only portion of claim I which is at issue is as follows: "positioning a concentrating funnel having a flat leading edge and a lower trailing inlet port in the salt water with the flat leading edge slightly below the layer of brine shrimp eggs and surface level of the body of water."

■ The court will not limit the position of the concentrating funnel to be "constant" and "immediate" as BAI urges. This court interprets a concentrating funnel as does the specification: "a funnel may be anything that is capable of receiving a slurry mixture of salt water and eggs in a controlled manner." Col. 3, lines 37–40 ('062 patent). In claim one, the funnel also must "concentrate," meaning that the structure used must be narrower or smaller at the rear than at the front.

As noted, *supra,* the positioning step is limited by the specification, wherein the "fact" or fundamental principle of the invention is that skimming, must occur two inches or less below the water surface, to positioning the concentrating funnel two inches or less below the water surface.

■ BAI argues that the "layer of eggs" in claim I must refer to a *naturally* occurring layer of eggs, not a cake of eggs created by encircling the naturally occurring eggs with an oil containment boom. This court declines to limit the layer of brine shrimp eggs in claim I to only those naturally occurring. Therefore, the layer of brine shrimp eggs would conceivably cover an artificially created layer of eggs.

BAI finally argues that claim I requires a continuous, one-step and automated procedure for harvesting brine shrimp eggs. The court will not impose such an interpretation on method claim 1, but rather will consider claim one a series of steps, as is articulated in the claim.

#### 4. *Claims 2–4 and 15–18*

Following the court's interpretation of the disputed terms of three independent claims above, there is no dispute or argument about the language of the independent claims at issue. Therefore the court declines to comment or interpret these claims beyond the plain meaning of the language contained therein.

### B. PATENT INFRINGEMENT

Sanders contends that BAI's harvesting device and method infringe claims 1–4, 8 and 15–20 of the '062 patent both literally and under the doctrine of equivalents. If a claim reads precisely on the accused device or method, there is literal infringement. Otherwise, infringement by virtue of the doctrine of equivalents may exist if the accused device or method is, in fact, substantially the same thing or method, used in substantially the same way, to achieve substantially the same result as the claimed device or method. *SRI International,* 775 F.2d at 1123, 227 U.S.P.Q. at 587. The doctrine's purpose is to discourage a copier from making insubstantial changes and substitutions in a patent. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607–08, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 U.S.P.Q. 328, 330 (1950). The doctrine of equivalents should be used conservatively and is not "regularly available to extend protection beyond the scope of the claims." *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538, 20 U.S.P.Q.2d 1456, 1458–59 (Fed.Cir.1991). As stated, supra, the focus of this case is on independent method claim 1 and independent device claims 8 and 20.

#### 1. LITERAL INFRINGEMENT

Whether a claim has been literally infringed involves two steps. First, the court must interpret the claims as a matter of law to determine their meaning and scope. *Markman,* 52 F.3d at 976. Second, it must be determined whether each limitation of the properly construed claims is found in the accused device or method. *Hormone Research Foundation, Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1562, 15 U.S.P.Q.2d 1039, 1042 (Fed.Cir.1990). To establish literal infringement, each limitation in a claim must be found in the accused product, exactly. *Becton Dickinson and Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796, 17 U.S.P.Q.2d 1097, 1099 (Fed. Cir.1990). The burden of proving infringement by a preponderance of the evidence falls on the patentee. *SRI International,* 775 F.2d at 1123, 227 U.S.P.Q. at 587. The court finds that the BAI device literally infringes claim 1, 8 and 20.

#### *Claim 1*

The BAI method of harvesting brine shrimp eggs literally infringes claim I as interpreted by this court. B & J locates a layer of buoyant brine shrimp eggs on a body of salt water. They position a concentrating funnel having a flat leading edge and a lower trailing inlet port in the salt water with the flat leading edge slightly below the layer of brine shrimp eggs and surface level of the body of water. BAI's metal collecting structure has a flat, leading edge, and has inlet ports to the pumps at the rear that are lower than the flat leading edge.[28] The front end of BAI's platform is wider than the rear end.[29] BAI's height adjustment mechanism allows the leading edge to be positioned at any location up to about 12 inches below the water.[30] To harvest, BAI positions the flat

28. Exhibits J, K and K, Exhibit O at 30–31, 35, 34, 54; Exhibit P at 215,236, Plaintiff's Memorandum in Support of Sander's Cross–Motion for Summary Judgment and in Opposition to Bonneville Artemia's Motion for Summary Judgment or in the Alternative for Partial Summary, Judgment (hereinafter "Sander's Cross–Motion for Summary Judgment").

29. Exhibits K, I, H, C and D; Exhibit O at 52, Exhibit P at 219–20, Sander's Cross–Motion for Summary Judgment.

30. Exhibits O at 56–59; Exhibit P at 195–96, 207.

leading edge of its collecting structure under the layer of eggs and a portion of the water. As interpreted by the court, claim I does not require "constant" adjustment.

BAI causes relative movement between the leading edge of the concentrating funnel and the eggs to collect a portion of the layer of eggs within the funnel and inlet port as a slurry mixture of salt water and eggs. BAI argues that its method does not involve a "one–step" process,[31] but involves additional steps including encircling the eggs with an oil boom, which makes its process substantially different from Sanders'. As interpreted by the court, claim 1 does not involve simply a one step process, but embodies a number of steps, all of which are practiced by BAI. Once the brine shrimp egg cake is formed by BAI, BAI workers manually rake the bergs into their working platform. Thus, through its raking procedure, BAI causes relative movement between the cake, or layer or eggs, and the concentrating funnel.

From the concentrating funnel, BAI pumps a slurry mixture to at least one porous container which passes the salt water and retains the collected brine shrimp eggs. Therefore, in comparing claim I as interpreted by this court to the accused BAI method, this court finds that BAI infringes claim I of the '062 patent.

### Claim 8

The contested elements of claim 8 as interpreted by the court read on the BAI device.

The working platform of the accused device has a channeling structure with a forward receiving end and rearward feeding end. The forward end of the BAI harvester has a base plate with a flat, leading edge which can be positioned immediately below the brine shrimp eggs at the water surface. The BAI working platform is adapted to receive water and entrained eggs at the channel *receiving* end and to channel the entrained eggs toward the feeding end. Exhibits 8,9 and 10 of BAI's Appendix.

 BAI's device has a height adjustment mechanism coupled to its working

platform that can be adjusted to heights of two inches or less below the water surface. The leading edge of the working platform can be placed at a depth slightly below the surface of the water and the entrained eggs which allows the working platform to be used to collect the entrained eggs within the platform. BAI argues that its working platform won't work at depths of 1 inch or less because the hose portal holes are at 1/2 and 1 inch below the front of the working platform and the pumps are not primed properly. Exhibits 8, 9, 10 and 11, BAI's Appendix. BAI apparently concedes, however, between 1 inch and 2 inches below the surface of the water, BAI's device would work properly because the hose portal holes would be under water. A device does not have to work perfectly to infringe. *Paper Converting*, 745 F.2d at 20, 223 U.S.P.Q. at 597. "[A]n accused product that sometimes, but not always, embodies a claimed method nonetheless infringes." *Bell Communications v. Vitalink Communications*, 55 F.3d 615, 622–23, 34 U.S.P.Q.2d 1816, 1822 (Fed. Cir.1995) The BAI platform can be selectively adjusted to any depth up to 12 inches below the water surface, This court finds that the BAI harvesting device literally infringes claim 8 of the '062 patent.

### Claim 20

The BAI device satisfies the contested elements of claim 20 of the '062 patent as interpreted by this court. The channeling structure of this accused device includes an open forward feeding end and a smaller rearward feeding end. Exhibits 8,9,10 and 11, BAI's Appendix. It includes a flat leading edge attached at the forward receiving end which is adapted for use immediately below the water surface at a depth of no greater than one inch to divide off water and suspended brine shrimp eggs for delivery into the channel structure. A hand–crank allows the structure to be positioned and maintained approximately at the water surface, and leading surface being selectively positionable at a

---

**31.** Apparently, Sanders argued in the *Salt Lake Brine Shrimp* case that his invention involved harvesting in a "single step." This court will not restrict Sanders to this interpretation under the doctrine of judicial estoppel. *See* text on pages 905 and 906.

depth of less than one inch below the water surface

Although BAI argues that its pumps won't prime at less than one inch of water, and that its device is difficult to adjust, an accused device need not work perfect to infringe. *Paper Converting*, 745 F.2d at 20, 223 USPQ at 597 This court finds that the BAI device literally infringes claim 20 of the '062 patent.

### Claims 2-4 and 15-18

Claim 2 modifies the positioning step of method claim I to require the buoyant platform, with the funnel attached thereto, to be placed within the layer of eggs on the water surface and adjusting the concentrating funnel to the defined position below the water level with the leading edge of the concentrating funnel in substantial parallel relationship with the surface level of the water. The BAI working platform, as designed is to be placed in a parallel relationship with the surface of the water, and as damaged, is still in "substantial parallel relationship" with the water surface. The BAI buoyant platform, with its working platform attached, is placed within the layer of eggs in their method of harvesting brine shrimps eggs. The BAI working platform, or "concentrating funnel" is adjusted to be below the water level with the leading edge substantially parallel with the water surface. The court finds that the BAI device literally infringes claim 2.

Claim 3 further comprises the method of claim 2, with the addition of the step of pumping the slurry mixture to at least one porous container supported on the buoyant platform. BAI's method performs this step. Therefore it infringes method claim 3.

Claim 4 comprises the method of claim 2 with the addition of extending a diverging channel structure forward of the concentrating funnel and within the layer of eggs to further gather and concentrate egg content within the slurry water feeding into the funnel. BAI's oil boom containment method performs this task. The oil containment boom is extended from rollers attached to the sides of the larger forward opening of the BAI working platform in order to encircle the egg slick. Exhibit 5 and 9, BAI's Appendix. The oil containment boom extends in a diverging manner to encircle the egg slick

and then drawn tighter to form a cake. This concentrates the shrimp eggs and prepares them to be raked into the working platform with water to form a slurry which is pumped into porous bags Claim 4 literally reads on BAI's oil containment boom method of brine shrimp egg harvesting.

Claim 15 is essentially redundant of claim 8 as interpreted by the court, therefore, the same comments and findings with respect to claim 8 apply to claim 15.

Claim 16 adds a further limitation that the height adjustment means provide selective leveling adjustment to position the flat leading edge to a depth of less than one half inch below the water surface, thereby minimizing the amount of water extracted with the shrimp eggs. The BAI device can be selectively adjusted at depths of less than one half inch, although the operating performance of the device would decline, it need not be perfect. *Paper Converting*, 745 F.2d at 20, 223 U.S.P.Q. at 597. The court finds that the BAI device infringes claim 16.

Claim 17 adds the further limitation on the height adjustment means of a jack having a height adjustment element and means for coupling the element to the leading edge, and a jack handle for selecting the desired height to the adjustment element. Claim 17 reads on the BAI height adjustment mechanism and therefore literally infringes.

Claim 18 further limits the extraction means of claim 8 to include a pumping system having an intake end and output end, said intake being coupled to the feeding end of the channeling structure and the output end being positioned at the porous container. Claim 18 reads on the extraction means of the BAI device and it therefore literally infringes this claim.

### 2. THE DOCTRINE OF EQUIVALENTS.

The doctrine of equivalents allows a patent holder to assert infringement of a device or method which does not correspond to the literal terms of the claims of the patent but performs substantially the same function in substantially the same way to obtain the same result. *Chisum, Chisum on*

*Patents,* § 18.04; *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856, 85 U.S.P.Q. at 330. The Federal Circuit has declared that determining devices "equivalent" to a means plus function claim and determining infringement under the doctrine of equivalents are both questions of fact. D.M.I., 755 F.2d at 1575, 225 U.S.P.Q at 239. Because this court finds literal infringement, the doctrine of equivalents does not come into play because that doctrine has application where there is no literal infringement. In this regard, in *Graver Tank.,* 339 U.S. at 607, 70 S.Ct. at 855, 85 U.S.P.Q. at 330, the Supreme Court stated:

> "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it."

*see also, Hilton Davis Chemical Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1522, 35 U.S.P.Q.2d 1641, 1648 (Fed.Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996) ("The trial judge does not have discretion to choose whether to apply the doctrine of equivalents when the record shows no literal infringement.").

 BAI also argues that under the reverse doctrine of equivalents, there is no infringement. The reverse doctrine of equivalents operates to defeat the patentee's action for infringement when the claims literally read on an accused device, but the device is so far changed in principle from the patented article that it performs the same or a similar function in a substantially different way. *Graver Tank,* 339 U.S. at 608–09, 70 S.Ct. at 856–57, 85 U.S.P.Q. at 330, *SRI International,* 775 F.2d at 1123, 227 U.S.P.Q. at 587.

 BAI bases its argument concerning the doctrine of equivalents and reverse doctrine of equivalents on several features of its invention: (1) its operation is not a continuous, automated, one-step procedure; (2) it does not employ a "channeling structure" which channels the entrained eggs towards the back of the skimmer in an automated fashion, (3) BAI employs manual labor to gather, pull and drag chunks of egg cake into the working platform; (4) its working platform cannot receive egg slurry in a "controlled manner;" (5) its front leading edge of the working platform is canted, not flat or horizontal to the water surface; (6) the edge cannot be selectively, immediately or constantly adjusted; and (7) the edge cannot skim or divide off a layer of eggs from the water's surface while maintained immediately below the eggs layer at depths of two inches or less below the water surface. Under the court's interpretation of the patent claims at issue, the BAI device and method are not substantially different from the patented invention.

This court finds literal infringement and also finds that the BAI device and method are not so different in principle from the patented device and method as to warrant awarding non infringement under the reverse doctrine of equivalents. The BAI device does perform the same function of brine shrimp egg harvesting in substantially the same way and in a way which literally reads on the '062 patent claims

## CONCLUSION

Based on the foregoing, this court holds that the '062 patent is valid and the BAI brine shrimp egg harvesting device literally infringes method claims 1–4 and device claims 8, 15–18 and 20 The court also determines that the reverse doctrine of equivalents does not rescue BAI from infringement and that the BAI device is sufficiently similar to the patented device and method to support infringement.

Accordingly, Sanders' motion for partial summary judgment is GRANTED on the issues of validity of the patent and patent infringement BAI's motion for summary judgment or partial summary judgment is DENIED on the issues of patent invalidity and non–infringement.

It is SO ORDERED.

Counsel for Defendant is directed to prepare and lodge with the Court within 30 days a form of judgment consistent with this Memorandum Decision and Order after complying with local rule 206(b).